WALTER LAAS, d/b a LAAS CONSTRUCTION, Plaintiff and Respondent, v. THE MONTANA STATE HIGHWAY COMMISSION, and ALEX BLEWETT, J. M. NASS, ARLONG M. SWANSON, DALLIS W. VAN DELINDER and JOHN J. LEARY, all individual members of the Montana State Highway Commission, and the STATE OF MONTANA, Defendants and Appellants.

No. 11877.
Submitted November 18, 1970.
Decided March 30, 1971.
Rehearing Denied April 29, 1971.
483 P.2d 699.

122

Affirmed in part; reversed in part and remanded with directions.

Harrison, Loendorf & Poston, Helena, James T. Harrison, Jr., argued, Helena, N. A. Rotering, Highway Atty., Helena, for defendants-appellants.

Leif Erickson, argued, and Leif B. Erickson, appeared, Helena, for plaintiff-respondent.

The HONORABLE ROBERT S. KELLER, District Judge, sitting in place of MR. CHIEF JUSTICE HARRISON, delivered the Opinion of the Court.

This is a multiple count action for damages arising out of a contract to grade and drain six and one-half miles of road extending from U. S. Highway No. 2, west of Troy, Montana, northward along the Yaak River, and constituting for the most part, new road.

A jury verdict in the district court of Lewis and Clark County, the Honorable Jack Shanstrom presiding, awarded damages

to the plaintiff in five parts, totaling $250,532. A motion for new trial was denied. The defendants appeal from the judgment, and from denial of the motion for new trial.

Plaintiff, and respondent, is a road construction contractor, and had been so engaged for some 22 years in varying degrees prior to the letting of the contract that is the subject matter of this action. Defendants and appellants (hereinafter referred to as the State) are the State Highway Commission of the State of Montana. Mr. and Mrs. Charles Emery, not parties to this action, owned property adjoining U. S. Highway No. 2, and across which went the first 2400 feet of the road to be graded and drained under this contract. The plaintiff made complaint in five areas:

(1)  That the State had failed to secure the right-of-way, causing the plaintiff and his men and equipment to stand by idly until the State had secured the right-of-way across the Emery property.

(2)  That there had been erroneous staking and as a consequence after work had been done, the staking error was discovered, restaked, and the work had to be redone.

(3)  That the State failed to pay an adequate amount for the rip rap.

(4)  That larger quantities of unclassified excavation material had to be furnished, and as a result of the dispute over the amount, the State failed to pay promptly.

(5)  That as a result of being tied up on this job, the plaintiff lost his bonding capacity, and thereby lost future profits.

The jury speciffically awarded $55,892 for the damages for failure to pay the remeasure promptly; $7,140 for the payment for the rip rap; $17,500 for the damages for erroneous staking; $92,000 for the damages for failure to secure the right-of-way; and, $78,000 for the damages for the loss of future profits, totaling the $250,532. The damages awarded for the payment for the rip rap in the amount of $7,140 are not in dispute and are eliminated from both the appeal and any further consideration here.

The contract for this job was let for bids by the State, and the plaintiff was awarded the contract, with an order to proceed with the work dated October 20, 1964. The contract provided that this was a 250 day job, with a penalty provision. The plaintiff started work on November 4, 1964, finished the project on November 11, 1966, and received a certificate of completion from the State on November 17, 1966.

The State filed condemnation proceedings against Mr. and Mrs. Charles Emery, to secure the right-of-way for this contract, and an open court stipulation was entered into between counsel for the State and counsel for the Emerys in September 1964, which was subsequently reduced to writing, for the purpose of giving the State a grant of possession which an order of possession could follow. The written, signed stipulation inadvertently remained in the file of the counsel for the Emerys until about a week before the trial of this action in late November of 1969, when it was filed in the Emery proceedings, and as of the date of the trial of this action, no grant of possession nor order of possession had been made.

Appellants make five specifications of error:

(1) That the district court erred in not granting defendants' motions for a directed verdict as to the award of damages due to the alleged failure to pay promptly.

(2) That the district court erred in admitting a rental rate book into evidence for the purpose of computing damages for equipment idled by reason of the State's failure to secure the right-of-way, and for the equipment used for extra work involved as a result of the erroneous staking.

(3) Whether there was a breach of contract by the State for the alleged failure to obtain a necessary right-of-way across the Emery property for construction.

(4) That the district court erred in not granting the defendants' motion for a directed verdict on the question of future profits.

(5) That the district court erred in not granting the defendants' motion for a new trial.

There is little question but that there was a breach of contract by the State in failing to secure the right-of-way across the Emery property. The transcript is replete with testimony averring to the interference by Charles Emery throughout the project. Time and again he stopped the contractor from proceeding. Time and again the resident engineer advised the plaintiff to stop work because of Emery interfering, and time and again the plaintiff requested clearance across the Emery property. The standard specifications, one of the contracting documents, specifically provided that the State would provide all of the right-of-way for the roadway without cost to the contractor. The same document further provided that if the right-of-way had not been obtained at the time when the bids were opened, the award would not be made until the entire right-of-way had been obtained. Clearly, the plaintiff had a right to assume, when he received the award and the order to proceed, that the right-of-way had been obtained, or would be obtained without detriment to him.

The standard specifications take into account that there may be delay between the time the bids are opened and the award is made because of unavoidable difficulties in securing the right-of-way, and further provide that no claim for damages or loss of anticipated profits on that account may be made. But, no provision is made for delay in securing right-of-way after the award has been made and the order to proceed given. The standard specifications further provide that if the contract is materially delayed because of right-of-way difficulties, due consideration will be given by the State in extending the contract time to make proper allowance therefor. This may assist the contractor in avoiding the penalty clause, but it is a far cry from compensating him for idled men and equipment because of delay brought about by the failure of the State to secure the right-of-way before awarding the contract, or in reasonable time thereafter.

However, the State goes further, and contends that the interference by Mr. Emery produced a "supervening impossibility of performance" or an "unanticipated difficulty" for the plaintiff. No useful purpose is served by an analysis of the citations provided by appellants; the State had both an open court stipulation and an executed, written stipulation for a grant of possession, in a pending condemnation proceeding. It would have taken but a day to get an order of possession from the district court of Lincoln County, wherein the condemnation proceeding was pending, and then summarily eject Mr. Emery from the right-of-way. For reasons not evident in the transcript, this was never done, nor are the reasons for the State's failure to do this given.

As a result of the delay in getting on the Emery property, which included the delays encountered in working around the Emery property, the plaintiff produced a list of the equipment that was idled thereby, including the time that it was idled, all summarized, and offered as plaintiff's proposed Exhibit No. 9. Objection was made at the time to the exhibit on the grounds that it was not the best evidence. Concurrently with the offer of plaintiff's proposed Exhibit No. 9, the plaintiff offered his proposed Exhibit No. 10. This was a booklet published by the Montana Highway Department, entitled "Equipment Rental Rates," adopted by the Montana Contractors Association, Inc., and approved by the State Highway Commission of the State of Montana. A subtitle of the booklet, in parenthesis, was "Rates to be used on all extra work orders involving equipment rental on a force account basis." The plaintiff computed the rates for the equipment idled in his Exhibit No. 9 on the basis of the rates published in Exhibit No. 10. Objections were made, both on the basis of the lack of foundation and not the best evidence, to the introduction of the equipment rental rate book. Both exhibits were introduced over objection, and continuinng objection was made to the use of both exhibits throughout the trial.

The introduction of both exhibits, and more particularly the equipment rental rate book, was error.

The uncontradicted definition of "force account" work was extra work that arises on the contract, which is neither contemplated in the contract, nor is the rate provided for by the contract. An extra work order is issued and exact records are kept of the time in which the equipment is being operated, i.e., the only time that force account rates apply, is when a particular piece of equipment is in operation, when the work is being done. It assumes a situation wherein a contractor has to get a particular piece of equipment for a limited period of time. There is no higher rate for the use of equipment.

"Bare rate" is the cost to have the equipment on the project in use without an operator and without the cost to service and maintain that particular piece of equipment. "Service rate" is the rate on a piece of equipment which requires service and maintenance to keep it in operation, i.e., to provide fuel, to service it, change oil, filters, grease, etc. The force account rate, because of the particular type of equipment used for such a short period of time, is a higher rate than the service rate, which in turn, is about 50% higher than the bare rate.

The plaintiff himself testified that there was no force account work involved on this project. In the instant case, the plaintiff's counsel simply had the plaintiff refer to his list of equipment idled, refer to the rental rate book, and then testify as to whether or not those rates were reasonable. The plaintiff testified that they were reasonable, and "In fact it's a little more than what you would ordinarily get if you rented them to another individual."

The plaintiff should have given evidence, on the basis of his actual work records, rather than a summary, of what equipment was idled for what period of time, and what the reasonable rental would be for such equipment under those

circumstances, based upon what he was actually paying for rent for some of his rented equipment, or on the reasonable rental value of idled equipment.

However, while heretofore we have indicated that the original introduction of Exhibits No. 9 and 10 was error, we think in the context of the entire trial that it was harmless error. It would take a lengthy discussion to show all of the facets of this matter; suffice it to say here that the lack of foundation for Exhibit No. 9, the listing of the equipment, was subsequently supplied in detail including the plaintiff's loss of his records through a burglary.

Exhibit No. 10 falls in the same category; again the foundation was later supplied, and the various rates gone into in detail. Laas did not charge for operator time when the equipment stood idle, and he did testify as to the reasonableness of it. Even the State's witnesses did not fully dispute this. And, finally, the jury did not seem to be confused by it since it scaled down significantly the amounts shown. The complete opportunity had by the State's counsel with all witnesses to explain the rates and to examine the itemization of the individual pieces of equipment listed gave sufficient information to the jury. As stated before, the admission of the equipment rental rate book, plaintiff's Exhibit No. 10, was error, and the vice of permitting the introduction of this exhibit is that it put the burden upon the State to disprove that which the plaintiff had not proved, and in the course of doing this, the defendants proved the plaintiff's case. This should not have been permitted to have occurred, notwithstanding the error ultimately proved to be harmless.

The equipment rental rate book was again used to compute damages for the use of equipment in redoing the work occasioned by the errors in staking. Again, this was not force account work, was "service rate" work at best, and since it was work already contemplated by the contract, the rate for the work was included in the contract. What has

just been said as to the use of the equipment rental rate book, however, again applies, and the jury does not appear to have been misled, i.e., the award was scaled down by more than one-half, and is consistent with the contract rate.

■ The damages claimed by the plaintiff for the failure of the State to pay promptly dealt specifically with the alleged failure of the State to pay the plaintiff promptly for extra quantities of excavation material. There was a disagreement between the plaintiff and the State as to the amount of the excavated material, and in October 1966, the parties signed a remeasurement agreement, which in essence, provided for a remeasurement of the quantity involved. This remeasurement was completed in November, sent to Helena to the IBM Division, returned to the State Highway Commission and the payment factor for distance is then computed with respect to the amount hauled. This was all completed in the early part of January, and a state warrant was issued late in January 1967, and cashed by the plaintiff on January 31, 1967. The warrant was for some $60,000, of which some $50,000 was for the remeasurement. The plaintiff still did not agree, and there was another remeasurement some time later, with an additional payment of some $21,000 in January 1968. The plaintiff's evidence was concerned with the payment of the $50,000 in January 1967, and the testimony makes it obvious that the plaintiff was confused as to the time of payment, confusing the payment in January 1968 with the amount due and paid in January 1967. Both the complaint and the plaintiff's evidence dealt with the $50,000 that was paid in January, 1967, for which there was no unreasonable delay. The State's motion for a directed verdict as to the issue for damages for failure to pay promptly should have been granted.

■ The State requested a directed verdict on the question of future profits, and alleges error on the part of the district court for not granting the request. In essence, the plaintiff alleges he was so entangled over this particular contract, and

went so far in debt as a result of the delays in this contract, that he lost his bonding capacity, and thereby lost profits in the years 1967, 1968 and 1969. He proved he had always been a successful contractor, had always made a profit on all of his jobs over some 22 years, and on that basis, he lost anticipated or future profits for the three years in question to the extent of $250,000. The jury agreed with him to the extent of $78,000.

This figure arrived at by the jury appears to us to be reasonable. Two accountants, one for each side, went into the plaintiff's income for a period of years. His gross, his net, his depreciation and all other facets were covered. Additionally, the period of time used was but three years. In other words, future profits on a speculative basis were not allowed. Rather, future profits for the immediately foreseeable period with a complete background were arrived at by the jury.

The State took the position that such profits were too speculative, and that as a matter of law they should have been denied. The State took the position that if projects were available, and if he were able to get a bond, and if he submitted a bid, and if the bid were awarded to him, and if he could make a profit on that job, then, and only then, would his profits be known, and provable. However, as previously discussed, the history of Laas as a contractor was fully explored. The opportunities were available for work and the period of time was reasonably short.

5 Corbin on Contracts, § 1029, provides as an alternative measure of damages where the profits presented are too uncertain:

"Where it is clear that the defendant's breach of contract has prevented the plaintiff from making profits the amount of which cannot be proved with reasonable certainty, it should be remembered that this situation has been brought about by the wrongful conduct of the defendant. He should not be allowed to escape by merely paying nominal damages if there

is any reasonable way in which the amount that he should pay as damages can be determined. There are a few alternative rules for determining this amount. Their purpose is to make compensation for the profits prevented and losses caused, measuring the amount by a method that is reasonably definite, and that is not likely to give compensation in excess of the profits that would have been made, and the losses that have been suffered. Thus, where the breach by the defendant has prevented the use and operation of property by the plaintiff from which use profits would probably have been made, the damages to be recovered may be measured by the rental value of the property, or by interest on the reasonable value of the property as an investment."

Restatement of the Law of Contracts, § 331, at p. 515 reads as follows:

"(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

"(2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property."

See also, 22 Am.Jur.2d, Damages, §§ 56-62.

The general rule of Hadley v. Baxendale, 1854, 9 Exch. 341, 156 Eng.Reprint 145, is embodied in our section 17-301, R.C.M. 1947, which provides that the measure of damages in a contract breach is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. This statute was cited in Myers v. Bender, 46 Mont. 497, 508, 129 P. 330, 333, a case dealing with a contract for the payment of fees. This Court there held:

"If the defendant had made full payment upon the completion of plaintiff's services, he would have fully performed his contract. Since he did not make such payment, he is to be held to compensate plaintiff for the detriment 'proximately caused' by the delay. 'In the ordinary course of things' the only detriment which could result to him was the loss by plaintiff of the use of the money. Therefore, full compensation for the detriment thus caused is to be measured by the principal amount due, together with interest at the legal rate up to the date of trial, allowing, of course, credit for such payments as have been made, at their respective dates."

The holding of *Myers* has been continuously affirmed by this Court and as recently as 1966 in Wyatt v. School Dist. No. 104, 148 Mont. 83, 417 P.2d 221.

The loss of bonding capacity in an entanglement such as the instant case is clearly foreseeable, and in the ordinary course of things, would be likely to result therefrom. Cruse v. Clawson, 137 Mont. 439, 448, 352 P.2d 989, 994, stated:

"It is agreed by both appellant and respondent that in Montana the rule is that a person may recover for loss of profits where it is shown that such loss is the natural and direct result of the act of the defendant complained of and that such amount is certain and not speculative. * * *'Profits which are a mere matter of speculation cannot be the basis of recovery in suits for breach of contract, while profits which are reasonably certain may be. Smith v. Fergus County, 98 Mont. 377, 39 P.2d 193.' "

There is no question but that the plaintiff was damaged by reason of the breach of the contract by the State. The evidence reflected the plaintiff had been averaging an annual gross volume of business in excess of $300,000 for the four year period immediately prior to the completion of the contract. The jury awarded less than 10 per cent per year for profit for the three year period following the completion of the contract. In the face of no rebutting evidence, we find

nothing unreasonable in either the amount nor the way in which the amount was determined, under the facts of this case.

The case is remanded to the district court to delete the item of $55,892 for damages for failure to pay the remeasure promptly, and to otherwise affirm the verdict. Each party shall bear its own costs.

MR. JUSTICES JOHN C. HARRISON, DALY and CASTLES, and THE HONORABLE LeROY McKINNON, District Judge, sitting for MR. JUSTICE HASWELL, concur.