No. 14712

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

JAY STOVALL and JUANITA STOVALL,

       Plaintiffs and Respondents,

  -vs-

LILLIAN WATT, DAN HARDY and FERN HARDY,

       Defendants and ·Appellants.

---

Appeal from:  District Court of the Thirteenth Judicial District,
            Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellants:

        Hibbs, Sweeney and Colberg, Billings, Montana
        Maurice R. Colberg, Jr., argued, Billings, Montana

    For Respondents:

        Freeman and Martin, Hardin, Montana
        Laurence R. Martin argued, Hardin, Montana

---

                Submitted:  September 18, 1979

                  Decided: APR 3 0 1980

Filed:

*Thomas J. Kearney*
                    Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The Stovalls, plaintiffs below, appeal from a judgment and order of the Big Horn County District Court denying their request for specific performance of an option to purchase clause contained in a lease which the Stovalls had entered into with Lillian I. Watt. Defendant Lillian Watt also cross-appeals from an award to the Stovalls of $9,600 in damages for her breach of agreement to convey the real property involved. The trial court determined that defendants Dan M. Hardy and Fern A. Hardy had superior equitable claims to the purchase of the land involved as a result of a lease option to purchase agreement which they also had entered into with defendant Lillian Watt.

The essential contention of the Stovalls is that the trial court abused its discretion by not granting their claim for specific performance of the option to purchase clause contained in a lease dated March 3, 1969. The primary contention of defendant Watt in her cross-appeal seeking to avoid damages awarded to the Stovalls, is that the Stovall lease had no inception in fact and that the lease was also subject to a condition precedent that the Hardys vacate the land involved, and that the Hardys never did vacate the land.

The problems began with the death of Edmund Andrett who owned the property in question until his death in June 1966. Andrett had previously used C. D. Wolfe of Farm and Ranch Management Co. of Billings to act as his agent in leasing the land involved. Through a continuing series of leases the Hardys had leased the land from the agency since 1951. The problems began when the leasing agency dealt directly with the Hardys after the death of Edmund Andrett but where Lillian Watt dealt, through her attorney, primarily, with the Stovalls.

-2-

Lillian Watt, an elderly Seattle, Washington resident, became the owner of the property involved by virtue of a decree of distribution entered on July 18, 1967. The property was then subject to an existing Hardy lease. She retained Missoula attorney, Dwight N. Mason, to handle her affairs concerning the property. During all of the proceedings or transactions in relation to the land, she had never gone to see the land in this state located in Big Horn County. The Hardy lease was to expire on March 1, 1968. Prior to this time, however, Lillian Watt and the Hardys were disputing lease rental payments. For some reason, Lillian Watt believed that the Hardy lease had expired and that the Hardys were in default on rental payments. For this reason, she contacted attorney Mason and asked him to find a new tenant. Unknown to Lillian Watt or to attorney Mason, however, the leasing agency managed by Wolfe, had entered into a renewal lease with the Hardys on March 1, 1968. This lease was recorded on November 22, 1969. The problem became complicated then because attorney Mason had, pursuant to Lillian Watt's instructions, found another tenant for the farmland and entered into a lease and purchase option with the Stovalls.

The following circumstances led to the Stovall-Lillian Watt lease option to purchase agreement. Attorney Mason wrote a letter to the father of Jay Stovall and solicited him as a tenant. Jay Stovall's father had died however, and the letter was passed along to Jay Stovall, who was ranching property adjacent to the Lillian Watt property occupied by the Hardys. Jay Stovall and his wife met with attorney Mason in Missoula in early February 1969, and expressed their interest in leasing the property. Mason told the Stovalls

that Lillian Watt would be receptive to an offer to lease the land involved because she was then having problems with the Hardys and did not want to continue leasing to them. After returning home, the Stovalls sent a written offer for lease terms, negotiations ensued, and finally attorney Mason prepared a lease dated March 3, 1969 and Lillian Watt and the Stovalls signed it. This lease was recorded on September 22, 1969, a month before the Hardys recorded their lease from the leasing agency managed by Wolfe.

The Stovall lease was for a three year term starting March 3, 1969 and it also included a preferential right of renewal and an option "to meet the purchase price offered" in the event of any sale during the term of the lease. Another clause recited that ". . . possession thereof to be given as soon as present tenant (the Hardys) vacates same . . ." The Hardy lease also contained an option to purchase clause similar to that contained in the Stovall lease. Although the Stovalls knew that the Hardys were occupying the land attorney Mason told them that if any problem arose as to possession that he would evict the Hardys and place the Stovalls on the land as the tenants.

Problems erupted almost immediately because of the two competing leases and claims made by the respective parties. Upon receiving a signed copy of their lease the Stovalls immediately proceeded to claim possession of the land. They rebuilt some fences, opened up gates, and moved their cattle from adjoining land onto the Lillian Watt property. This sparked action by the Hardys, who were occupying the land. They moved the cattle off the property and locked the gates. These acts triggered a series of communications between attorney Mason, the Hardys, Lillian Watt, and Wolfe, the manager of

-4-

the leasing agency who had signed the lease with the Hardys. From these communications it was learned that the Hardys were not actually in default on the rental payments, and that the Hardys had entered into the March 1, 1968 renewal lease with agent Wolfe. The Hardys had paid the rental money to agent Wolfe.

Wolfe then tried to settle the rents with Lillian Watt on March 21, 1969, but she rejected his offer, returned his check, and told Wolfe that she would not accept any rent from the Hardys for 1969. On April 5, 1969 Lillian Watt wrote to attorney Mason and told him she would not ratify the Hardy lease. Lillian Watt and attorney Mason then suggested a compromise agreement between the competing lessees whereby the Hardys would be allowed to have the cropland through the 1969 crop season and the Stovalls would use the grazing land. The Stovalls did not need the grass until fall, and they felt that under customary practice the Hardys would, in any event, be entitled to the 1969 crop which the Hardys had planted. It appears however, that neither the Hardys nor the Stovalls ever specifically agreed to this compromise arrangement. In any event, the attitude of Lillian Watt toward the Hardys changed markedly after she decided to let the Hardys stay on the property through 1969.

Although she apparently believed at that time that the Hardys did not have a valid lease, Lillian Watt accepted the grazing rental from the Hardys. In September 1969, Lillian Watt decided to sell the property, and in June 1970, she sold the property to the Hardys. As a result of this sale to the Hardys, the Stovalls filed suit seeking specific performance from Lillian Watt, and that they were entitled to purchase the land rather than the Hardys.

In entering its order denying specific performance the trial court determined that Lillian Watt had relied in good

-5-

faith on attorney Mason's advice, and that out of this reliance flowed a series of factual and legal misapprehensions. The trial court decided that under the total circumstances of the case, equity would not permit the Stovalls to obtain the property by specific performance against Lillian Watt, and that damages awarded against Lillian Watt, would, under the circumstances, be the proper remedy. Under section 27-1-415(4), MCA, specific performance will not be enforced against a party to a contract if his assent was given under the influence of mistake, misapprehension, or surprise. Specific performance, will not, furthermore, be granted in a situation in which the total circumstances demonstrate that it would produce a hardship or injustice. Seifert v. Seifert (1977), 173 Mont. 501, 504, 568 P.2d 155, 157.

Here the Hardys were not delinquent on their lease payments and always believed they had a valid lease. Lillian Watt accepted the Hardys' rental payments before she decided to sell the property, although she claims she did not thereby ratify the Hardy lease previously executed by agent Wolfe. Attorney Mason sent letters to both the Hardys and the Stovalls soliciting offers for the purchase of the property, and the Hardys responded by making an offer to purchase the property. This sale was consummated by recording a deed on June 3, 1970.

To grant specific performance to the Stovalls would be to deprive the Hardys of property which they had continuously leased, farmed and operated since the early 1950's, and then later decided to purchase. The trial court made no findings that the Hardys were operating in bad faith. There can be no doubt that specific performance granted to the Stovalls would work a harsh result upon the Hardys who were actual occupants of the land for many years. Nor can we ignore the fact that Lillian Watt had substantially changed her

-6-

position by conveying the property to the Hardys and therefore she was in no position to convey the land to the Stovalls.

We cannot say, moreover, that the denial of Stovalls request for specific performance operates as harshly upon them. They never had possession of the property and made no lease rental payments under the lease they had signed with Lillian Watt. Although the Stovalls later wrote a letter to Lillian Watt and attorney Mason stating that they would meet the $20,000 offered by the Hardys and made arrangements for such financing, they made no payments toward a purchase price. In balancing the equities it is clear that the total circumstances favor the result reached here by the trial court. We note furthermore, that the trial court awarded damages against Lillian Watt for her breach of the agreement with the Stovalls, and the Stovalls had thus been made whole.

In contending that she should not have to respond in damages to the Stovalls, Lillian Watt contends that the Stovall lease was subject to a condition precedent that the Hardys vacate the property, which event never occurred. She thus contends that the lease did not in fact commence and thus no liability can accrue for any breach of the agreement permitting the Stovalls the right to meet the purchase price offered by anyone else. Such a contention, however, flies in the face of the clear language of the lease itself which provided that the term was to start "Three Years from and after the said 3rd day of March, 1969." Her contention is, moreover, inconsistent with the circumstances surrounding its execution and with her conduct in relation to the lease after its execution.

At the time she signed the lease with the Stovalls, Lillian Watt and attorney Mason had unfriendly feelings toward the Hardys, and it is clear they did not want them to continue

-7-

in possession. Indeed, until litigation appeared imminent, Lillian Watt consistently operated on the assumption that the Stovall lease was valid and she and her attorney had made efforts to place the Stovalls in possession. Furthermore, neither she nor her attorney ever contended that the Stovall lease was invalid at the time when the Stovalls were pressing her and attorney Mason for information on other bids so that the Stovalls could decide whether or not to meet any bids that had been made. Attorney Mason first put forth the theory that the Stovall lease was conditioned upon the Hardys vacating the property only after the sale terms to the Hardys had been agreed upon and attorneys for the Hardys had made a release of the Stovall lease, a title requirement. The trial court specifically found that the Stovall lease with Lillian Watt was not conditioned upon the Hardys first vacating the property. Substantial credible evidence supports this finding.

Under section 27-1-314, MCA, if the breaching party operates in bad faith, the measure of damages is the difference between the agreed price and the value of the estate at the time of the breach, plus expenses properly incurred in preparing to enter the land. The events here clearly demonstrate that Lillian Watt, directly, and indirectly through her attorney, acted in a fashion constituting bad faith.

By September 1969, Lillian Watt had decided to sell the property and had informed attorney Mason of her decision. By this time she had already signed the lease agreement with the Stovalls. Attorney Mason's letter to the Stovalls on September 15, 1969, informed them that the property was for sale and solicited an offer. Later, on October 16, 1969, the Stovalls sent a letter to Lillian Watt reminding her of the lease

-8-

agreement, their right to take possession, and the option to purchase provision in the lease. In this respect the Stovalls requested information as to any offer which Lillian Watt received so that the Stovalls could decide whether or not to meet the offer and exercise their rights under the lease. In response Lillian Watt wrote to the Stovalls on October 27, 1969 and told them that she did not know whether attorney Mason had received any bid from the Hardys, but she assured the Stovalls that they would most certainly be consulted and given a chance to meet the bid.

Nothing transpired until January 1970 when attorney Mason wrote identical letters to the Stovalls and the Hardys soliciting offers for the property. The Hardy's attorney responded with an offer of $20 per acre, making $19,200 the total offer. The Stovalls responded by telephoning both Lillian Watt and attorney Mason and asked to determine what bid they would need to meet in order to exercise their option under the lease agreement. But neither Lillian Watt nor attorney Mason gave a forthright answer to the Stovalls. Lillian Watt referred the Stovalls to attorney Mason and attorney Mason referred the Stovalls to Lillian Watt. At this point, the Stovalls could not obtain anything definite.

Sometime later, Lillian Watt mentioned a figure of $20,000 to the Stovalls, and in response the Stovalls wrote both Lillian Watt and attorney Mason asking for the exact figure which they had to meet if they were to exercise their option. Neither Lillian Watt nor attorney Mason responded to the Stovalls' request. Furthermore, at the time the Stovalls had written this letter, attorney Mason had already decided to accept the Hardy offer and in fact the attorney for the Hardys had already tendered a 10 percent down payment and a

-9-

contract for deed to attorney Mason. Mason, however, never disclosed this information to the Stovalls although it does appear that he told the Stovalls of the $20,000 offer made by the Hardys.

As a result of the Stovalls learning of the $20,000 offer by the Hardys, the Stovalls on March 27, 1970 sent letters to both Lillian Watt and attorney Mason advising them that they would meet this $20,000 bid and exercise their option under the lease. But neither Lillian Watt nor attorney Mason responded to the letters. Furthermore, Lillian Watt and attorney Mason failed to return numerous phone calls to them by the Stovalls in relation to the property involved.

Before the Hardys signed the purchase agreement, their attorney examined the abstracts and found a defect in title, namely, the Stovall lease with the option to purchase provision, which had been recorded on September 22, 1969. As a result of this, Lillian Watt signed a letter of indemnity to protect the Hardys from any damages which might flow as a result of any action brought by the Stovalls in relation to the property involved. Lillian Watt also agreed to pay any legal fees incurred in relation to such action brought by the Stovalls.

We cannot say, in light of all these circumstances, that Lillian Watt's conduct, both personally, and through her attorney, was less than bad faith in relation to the dealings with the Stovalls.

The damages awarded here are clearly within the limits of section 27-1-314, MCA. Damages were established by a simple process. Lillian Watt sold the 960 acres to the Hardys at a price of $20 per acre. Joe Cormier, a local rancher familiar with the market conditions for land sales, testified that the Lillian Watt land was conservatively worth

-10-

$30 an acre. Cormier had made a sale of his own ranchland at about the same time as Lillian Watt sold her property to the Hardys. Cormier received a price of $35 per acre for comparable land, but that was in conjunction with a ranch sale involving a large quantity of deeded land, plus leases. The trial court found that the Lillian Watt property was reasonably worth $30 per acre. There is no record, however, of any expenses incurred by the Stovalls preparatory to entering the land to take possession. There is testimony that one-half mile of fence was rebuilt, but no attempt was made to itemize the costs or expenses so incurred.

It is clear, therefore, that the measure of damages is the difference between the value per acre/ ($30) as found by the trial court, and the actual contract price/ ($20) which is $10 per acre. Accordingly, the trial court was correct in entering judgment against Lillian Watt for the amount of $9,600 and costs.

The judgment of the District Court is affirmed.

Daniel J. Shea
Justice

We Concur:

Chief Justice

Justices

-11-

Justice John C. Sheehy dissenting:

I concur in part and dissent in part from the foregoing opinion.

The statute under which the District Court granted the judgment in the sum of $9,600 to/the Stovalls was section 17-306, R.C.M. 1947, now section 27-1-314, MCA, which provides:

> "The detriment caused by the breach of an agreement to convey an estate in real property is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land." (Emphasis added.)

The District Court confined itself to that statute in determining damages. When one examines the language of section 27-1-314, MCA, above, one sees that damages thereunder can take two forms and two determinations: (1) a return of monies paid and expenses incurred in document preparation; and, (2) if bad faith is present the difference between the price agreed upon and the value of the estate agreed to be conveyed at the time of the breach.

Under the first portion of section 27-1-314, MCA, the District Court found that no damages had been proved, since no purchase price had been paid and there was no evidence relating to document preparation or other expenses. In connection with the second determination, the District Court found bad faith on the part of Lillian Watt, and on that basis awarded the damages stated above.

The District Court found that the conduct of Lillian Watt in refusing to recognize the option agreement as having any validity was bad faith "admittedly because of the guidance of [her attorney]." The District Court further found that

-12-

Lillian Watt was not guilty of fraud or misrepresentation, and it did not find that she had unclean hands as against the Stovalls. The controlling element as far as the District Court is concerned is that Lillian Watt, through the advice of her counsel, took the position that the Stovall lease was not a binding lease because the condition precedent, "possession thereof to be given as soon as present tenant vacates same . . ." never occurred. The District Court found that Lillian Watt's position that the lease was not binding until the possession transferred was not asserted at the time the Stovalls were pressing Mason and Lillian Watt for information on the bids so they could exercise the option, and that "it was not until after the sale to the Hardys had been agreed upon and Hardys attorney made a release of the Stovall lease a title requirement, that Mason put forth the theory that the Stovall lease was conditioned upon Hardy vacating."

This determination by the District Court however, does not square with the written evidence of the case. In the time when attorney Mason was soliciting bids from the Hardys and the Stovalls, between January 1970 and March 27, 1970, the latter date being when the Stovalls indicated they would meet the $20,000 bid, attorney Mason solicited the bids from both parties to avoid "cutthroat action". It also appears that when the facts of the dual leases became known to all the parties, that the attorney wrote both to Hardy and Stovall suggesting that they share the lease, one to take the lease for farm purposes, and the other to have the grazing privileges after the farming was completed in the fall. Indeed, on April 5, 1969, nearly a year before the sale to Hardys was consummated, Lillian Watt had written to her attorney "the lease to the Stovalls was contingent upon the Hardys moving off the place, and no money has changed hands . . ." I think the evidence is clear that the contention

-13-

that Stovall had a conditional lease was not an afterthought on the part of Lillian Watt, but her view of the legal status of the Stovall lease all along. While such legal position may have been mistaken, when we consider her actions from the aspect of bad faith, she cannot be characterized as a miscreant.

This brings us to a consideration of what constitutes "bad faith" in connection with an award of damages under section 27-1-314, MCA. It is a term that cannot be defined with scientific precision. It has been held that "good faith" is that ordinarily exhibited by a seller who is unable to perform through no fault of his own; while "bad faith" is that shown by a seller who refuses to perform though able to do so. Charles County Broadcasting Co., Inc. v. Meares (Md. 1973), 311 A.2d 27, 31. As applied to an insurer under an insurance policy it is said that "bad faith" embraces more than negligence and imports dishonest purpose or conscious wrongdoing. Simpson v. Motorists Mutual Insurance Company (7th Cir. 1974), 494 F.2d 850, 853. Although in Rasmussen v. Moe (1956), 138/ Cal.2d 499, 292 P.2d 226, 229, it was held that the negligence of a vendor which put him in a position of being unable to perform his contract was sufficient to show bad faith, it has also been held in California that in general bad faith extends beyond fraud or dishonesty and embraces unfair dealings; it often denotes a deliberate refusal to perform without just or reasonable cause. County of Inyo v. City of Los Angeles (Cal. 1978), 144 Cal.Rptr. 71, 77, 78 Cal.3d 82. A refusal to perform without just cause or excuse is sufficient to constitute bad faith according to Brandolino v. Lindsay (Cal. 1969), 75 Cal.Rptr. 56, 60, 269 Cal.2d 319.

I would hold that before bad faith may be found as to a vendor who refuses to perform an agreement to convey real estate, such bad faith must be based upon some motive of self-interest

-14-

or ill will toward the other party. Those elements are lacking entirely here. The refusal to perform has not benefited Lillian Watt. In fact, the evidence indicates that the property which she agreed to sell had a value at the time of the trial of $157,000. While that is not a factor to be considered, since section 27-1-314, MCA requires the value to be determined as of the time of the breach, it does indicate that she was not motivated by self profit or self-interest in refusing to convey the property to Stovalls. Nor can it be said from the evidence that her decision was based upon ill will toward Stovall. She made her decision apparently because she recognized that the Hardys had farmed her properties since the 1950's and had acted in good faith in making their lease payments and procuring a new lease from the agent of her predecessor in ownership. Of course, she had received no monies of any kind under the Stovall lease. Therefore since her actions do not constitute bad faith in the premises, the award of damages against her on that ground should be reversed.

Nothing I say here should be taken to mean that in a proper case a prospective vendee or option holder is precluded from recovering damages not only under section 27-1-314, MCA, but also under section 27-1-311, MCA. Section 27-1-311 is the general statute on the measure of damages for breach of contract, and incorporates the ancient principle of Hadley v. Baxendale (1854), 9 Exch. 341, 156 Eng. Reprint 145; Laas v. Mont. Hwy. Comm'n. et al. (1971), 157 Mont. 121, 131, 483 P.2d 699.

The general rule is that the measure of damages in a contract breach is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things will be

-15-

likely to result therefrom. Section 27-1-314, MCA, is not necessarily exclusive. Wiseman v. Holt (1973), 163 Mont. 387, 517 P.2d 711. But this case was tried under the theory that extra damages were recoverable on the ground of bad faith and on that ground I would determine that the award of damages against Lillian Watt must fall.

Accordingly, I concur in the majority opinion that specific performance is not applicable here but I dissent to the affirmance of the judgment against Lillian Watt in favor of the Stovalls.

-------------------------------
Justice