No. 85-342

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

CRYSTAL SPRINGS TROUT COMPANY,
a Montana corporation; THOMAS
NYQUIST and VIRGINIA NYQUIST,
husband and wife; KENNETH NYQUIST
and KATHLEEN NYQUIST, husband and
wife; RONALD PRESTON; ROBERT MOORE
and PEGGY MOORE, husband and wife;
and EARL BRADFORD and ALICE BRADFORD,
husband and wife,

    Plaintiffs and Respondents,

 -vs-

FIRST STATE BANK OF FROID, a banking
corporation, and JERRY B. WALLANDER,

    Defendants and Appellants.

---

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Broadwater,
The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

  For Appellant:

    Goetz, Madden & Dunn; James H. Goetz argued, Bozeman,
    Montana

  For Respondent:

    Gough, Shanahan, Johnson & Waterman; Ronald Waterman
    argued, Helena, Montana
    Garrity, Keegan & Brown; Donald Garrity, Helena,
    Montana

---

Submitted: October 21, 1986

Decided: January 15, 1987

Filed: JAN 15 1987

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

The First State Bank of Froid (Bank) appeals the judgment of the District Court, First Judicial District, County of Broadwater, awarding compensatory and punitive damages to plaintiffs Crystal Springs Trout Company (CSTC) and its shareholders for breach of an oral contract to loan money and for negligent misrepresentation. Plaintiffs have cross-appealed on two issues concerning the terms of the final judgment. We affirm in part and reverse in part.

The Bank raises eight issues:

1. Whether the District Court erred when it found Froid Bank liable for the tortious acts of its agent, Jerry B. Wallander, but concluded that Wallander had no personal liability?

2. Whether the District Court's damage award was erroneous because the District Court failed to determine that plaintiffs' damages were proximately caused by any of Froid Bank's acts?

3. Whether the District Court applied an incorrect measure of damages when it awarded the individual shareholders their entire initial investment plus interest for Froid Bank's breach of commitment to provide financing to CSTC?

4. Whether the District Court erred when it awarded damages to the individual shareholders for losses suffered by the corporation?

5. Whether the District Court erred in refusing to permit comparison of Jerry Wallander's misconduct with that of the CSTC principals?

- 2 -

6. Whether Jerry Wallander's conduct was sufficiently culpable to support punitive damages?

7. Whether the District Court erred in awarding defendant Froid Bank all of plaintiffs' assets and concomitant liabilities as an offset to damages awarded against both CSTC and the individual plaintiffs where CSTC's liabilities exceeded the value of its assets?

8. Whether the District Court erred in awarding the individual shareholders interest on their loss of investment at the rate of ten percent for periods prior to July 1, 1979?

The plaintiffs raise two issues on cross-appeal:

1. Whether Jerry B. Wallander is jointly liable for the judgment against the Bank?

2. Whether the damage award received by CSTC and its shareholders was inadequate?

FACTUAL BACKGROUND

Plaintiff CSTC is a Montana corporation, incorporated in 1977 for the purpose of raising trout for commercial sale. It was initially capitalized through the sale of common stock to Ron Preston, Tom Nyquist, and other members of the Nyquist family.

The other plaintiffs in this case are the shareholders of CSTC: 1) Tom and Virginia Nyquist; 2) Ken and Kathleen Nyquist, Tom's father and mother; 3) Robert and Peggy Moore, Tom's sister and brother-in-law; 4) Earl and Alice Bradford, Tom's wife's parents; 5) Ron Preston, Tom's business school friend and associate.

Defendants are the First State Bank of Froid and Jerry Wallander, former Bank president. Wallander succeeded his father as Bank president in 1969, and held that position until 1982 when he was asked to resign by the family. The

Froid Bank is essentially a family-owned Bank, with the Wallanders owning over 90% of the stock in the Bank corporation. Jerry Wallander and Ken Nyquist grew up together in Froid, and Wallander was also Ken's lawyer and business advisor.

CSTC was incorporated in May, 1977, and was the brain child of Tom Nyquist and Ron Preston, two 1973 University of Montana business school graduates. Its operations were located at Big Springs, a series of natural springs downstream from the dam at Toston, Montana. In the summer of 1977, Tom Nyquist began acquiring water and land leases for the trout farm. By the fall of 1977, construction was underway. Plaintiffs built a hatchery building and several dirt raceways. They continued to expand through the winter months, and by spring of 1978 had approximately 825,000 young fish in the raceways and 200,000 fingerlings in the hatchery.

On May 20, 1978, an earthen ditch which carried water to the project area breached. Approximately 700,000 fish in the raceways were destroyed. Prior to this washout, plaintiffs had planned to line the ditch with gunnite to strengthen it. As there had been no previous record of a washout on this ditch, they had planned to line the ditch after the upcoming 1978 season, financing the project with money from sales made during 1978.

CSTC was initially capitalized at $167,283. In February, 1978, Ken Nyquist bought $100,002 worth of stock bringing total shareholders' equity to $267,285. In addition, Tom Nyquist sought a Small Business Administration (SBA) loan from the Montana Bank of Missoula in the fall of 1977. A loan guaranty of $260,000 was issued in March, 1978. The loan package was then transferred to the Montana Bank of

- 4 -

Helena, but was never drawn upon due to the circumstances surrounding the washout. The loan guaranty was then allowed to lapse.

After the washout, the shareholders regrouped to determine a course of action. They ultimately decided to sell the project and simultaneously refinance it on a larger scale. Refinancing was sought through the Farmers Home Administration (FmHA) which had higher lending limits than the SBA. The attempted sale of CSTC was abandoned after an FmHA official reprimanded the principals for placing CSTC on the market and representing that a $950,000 loan commitment had been made by FmHA. (FmHA loans are contingent on the applicant's ongoing commitment to the proposed business.)

CSTC sought a $900,000 loan from FmHA for long term financing. Interim financing for construction and operating capital had to be raised by the borrower. However, in order to obtain interim financing, the borrower must obtain a "conditional Commitment for Guarantee" from the FmHA, which is issued only if certain FmHA requirements are met. Thus, until the permanent loan guaranty is issued, the borrower and his banker are liable for the entire investment. This means the borrower's bank must be willing and able to provide interim money, risking that all will go well until the conditional and finally the permanent loan guaranties issue.

Both plaintiffs and defendants were aware of these requirements. By August, 1978, Froid Bank was identified as the prospective lender for CSTC. Wallander, in his capacity as Ken Nyquist's lawyer, had first been contacted by Ken in February, 1978, when Ken asked his advice on buying stock in CSTC. In May, 1978, Ron Preston wrote to Wallander urging him to become involved with CSTC, saying the Bank's

involvement would be mutually beneficial to them both. In August, 1978, Wallander became involved by reviewing the FmHA application papers and indicating the Bank would act as the interim financier.

The FmHA application was partially completed by the CSTC principals and delivered to Wallander for completion and signing on October 19, 1978. The application was kept by him until after January 5, 1979, despite Wallander's claim to CSTC that he had filed the application with the FmHA office in Bozeman. On January 5, Wallander and the CSTC principals met to discuss interim financing and the 1979 construction season. At the meeting, Wallander stated that there would be "no problem" in getting financing from another overlining bank. The first cash advance was issued, secured by a promissory note signed by CSTC, and co-signed by Ken, Tom and Ron.

From January 5 through the summer of 1979, Wallander continued to assure CSTC principals that there was "no problem" with the interim financing. The Bank's customer lending limit was $160,000. A total of $260,000 was advanced by the Bank to CSTC between January 5 and June 23, 1979. Plaintiffs repeatedly questioned Wallander on the financing arrangements and he repeatedly answered that financing was "no problem." On June 2, when the $160,000 limit was reached, Wallander finally contacted First Bank Minneapolis, the bank he had represented as the overlining bank. First Minneapolis contacted Ron Preston in mid-June for "pre-loan" information, which confused Ron since he thought the participation of First Minneapolis had already been arranged. On June 25, Ron received a letter from First Minneapolis rejecting the offer to participate as an overlining bank.

In response to this letter, Wallander assured the CSTC principals he could line up several small banks to participate in the financing. This never came to pass and on August 3, 1979, Wallander indicated to Ron Preston that CSTC would have to cease operations.

Throughout the next few months, Ron Preston and Tom Nyquist tried to find other financiers for the project. Wallander never followed up on the leads which they gave him. CSTC's creditors began demanding payment and threatening repossession of equipment. Wallander proposed that Ken Nyquist borrow money on Ken's personal account to pay off the debts on a Peterbilt truck and a mobile home. Wallander would then transfer the titles of these items from CSTC to Ken, and the items would be pledged as security for Ken's loan. Ken signed a $8,000 note for the truck February 21, 1980, and a $9,640.11 note May 1, 1980 for the mobile home. Wallander never transferred title, and the truck was seized and sold by a CSTC creditor.

Wallander, Ken, Tom and Ron met one final time in the winter of 1980 to review the potential for refinancing. They agreed the situation was hopeless. Wallander assured them the Bank would take no action on notes owed either by Ken or CSTC. Communications between the parties ceased at this point. CSTC filed its original complaint against the Bank and Wallander in April, 1981.

PERSONAL LIABILITY OF AN AGENT

The first issue raised by both the Bank and CSTC is whether Jerry Wallander should be held liable on the judgment assessed against the Bank. The District Court held, in its conclusion of law no. 1:

> The conduct of defendant Jerry B. Wallander, acting at all times as agent of the First State Bank of Froid and with the acquiescence and tacit approval of the directors of the bank, constituted willful and wanton misconduct consisting of conscious breach of trust and fiduciary duty, intentional deception, flagrant breach of the ethical cannons [sic] of both the legal and banking profession, a studied and extended course of fraudulent misrepresentation and knowing betrayal of a lifetime friendship, all with reckless disregard for the rights and interest of the plaintiffs herein, unjustified by any circumstance and "malicious" and "oppressive" within the meaning of those terms as applied in the law of torts.

However, in its conclusion of law no. 11, the court held, "Plaintiffs are not entitled to recover damages from defendant Jerry B. Wallander."

By statute in Montana, an agent is jointly and severally liable with his principal to third parties for wrongful acts committed in the course of his agency. Section 28-10-702(3), MCA; See also Greening v. Mutual Life Ins. of New York (D. Mont. 1983), 558 F.Supp. 988, 991. In order to hold a corporate agent personally liable, the court must find that the agent was personally negligent or that the agent's actions were tortious in nature. The personal nature of the agent's actions forms the narrow exception to the general policy that officers and agents of a corporation must be shielded from personal liability for acts taken on behalf of the corporation. Little v. Grizzly Mfg. (Mont. 1981), 636 P.2d 839, 842, 38 St.Rep. 1994, 1997.

The strong language of the District Court's conclusion of law no. 1 indicates Wallander's breach of fiduciary duty and fraudulent misrepresentation was intentional and very personal, given his longstanding relationship with the Nyquist family. In light of this finding, we hold the District Court's failure to hold Jerry Wallander jointly and severally liable with the Bank was clearly erroneous, and we

reverse the court's decision on this point. See §
28-10-702(3), MCA.

PROXIMATE CAUSE, CORRECT MEASURE OF DAMAGES & INDIVIDUAL
SHAREHOLDER RECOVERY

The next issues raised by the Bank concern whether the
District Court's award to the CSTC shareholders of their
capital investments plus interest was erroneous. The Bank
argues that the loss of initial shareholder investment was
not proximately caused by the Bank's breach of commitment to
provide interim financing. The Bank claims the initial
shareholder equity capital was wiped out by the May, 1978,
washout and the expenditures of the 1978 summer construction
season. The Bank also claims its commitment to financing did
not occur until January 5, 1979, when the first cash advance
was issued from the Bank to CSTC and therefore the individual
shareholders are not entitled to recovery apart from the
corporation.

The District Court found actions of the Bank in failing
to provide interim financing proximately caused damage to
CSTC and its shareholders. The court also found that while
CSTC was in serious financial straits after the 1978 washout,
the company had been infused with an additional $260,000, a
great deal of work and planning, and was a "different"
business which collapsed for failure of credit one year
later. From the evidence here, CSTC's failure in the fall of
1979 was directly caused by the lack of the promised
financing.

There is sufficient evidence to support a finding that
the plaintiff shareholders would not have refinanced CSTC
unless they had guaranteed financial backing. The CTSC
principals repeatedly sought assurances from Wallander as to

- 9 -

whether the interim financing arrangements were in place. Wallander repeatedly assured them that financing was "no problem," and CSTC continued to receive cash advances upon request. The CSTC shareholders entered into the rebuilding and refinancing of the corporation in reliance on the Bank's misrepresentations that financing was available, and these misrepresentations were the direct and proximate cause of the failure of CSTC in August, 1979, and the loss of investment of the shareholders. The District Court properly found that a causal connection existed between the Bank's misrepresentations and the shareholders' reliance on those misrepresentations in embarking on a plan of refinancing.

It is clear that the District Court found, beyond breaching a contract, that the Bank had committed a tort. That the Bank's tort had proximately caused damages to the plaintiffs is inescapable. The District Court wrestled mightily with the problems of damages here.

The District Court assessed the "battle of the experts" in connection with the trout industry.

The Bank had produced a trout industry expert ("a captain of the trout industry," said the District Court) who appraised the project at CSTC and gave his opinion that it had no chance of success. The plaintiffs produced another expert, though less formidable on the subject than the Bank's expert, who prognosticated a modest chance of success. The District Court also heard from experts in accounting, and it weighed the business experience of the plaintiffs, the market research that had been done, and the technical expertise that was necessary. The District Court concluded that it could not determine that the enterprise would undoubtedly succeed, nor that it would certainly fail.

When the fact of damages is established in the evidence, leeway is given to the trier of fact to determine the amount of the damages.

> Courts indicate that there is a distinction between the quality of proof necessary to establish the fact that the plaintiff has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. Although formerly the tendency was to restrict the recovery to such matters as were susceptible of having attached to them an exact pecuniary value, it is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount and that where it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence-with such certainty as the nature of the particular case may permit-lay a foundation which will enable the trier of facts to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.

22 Am.Jur.2d Damages, § 25 (1965).

The statutory limitations which circumscribe the trier of fact in determining damages are that they must in all cases be reasonable, § 27-1-302, MCA, and in cases of breach of contract, be no greater than the other party could have gained by full performance unless a greater recovery is specified by statute. Section 27-1-303, MCA. The measure of damages for the commission of a tort is the amount which will compensate the other party for all the detriment proximately caused thereby, whether it could have been anticipated or not. Section 27-1-317, MCA.

The statute on the measure of damages for breach of contract, § 27-1-311, MCA, includes the limitation that such damages "which are not clearly ascertainable in both their

nature and origin cannot be recovered." No such limitation appears in the statute on the measure of damages for tort. Section 27-1-317, MCA. Tort damages specifically are allowable for proximately caused damages, "whether they could be anticipated or not." This Court, nevertheless, has recognized and adopted the proposition that in a contract action once a plaintiff establishes a right to damages, the defendant is liable for damages calculated in a reasonable way. We said in Laas v. Montana Highway Comm'n (1971), 157 Mont. 130-131, 483 P.2d 699, 704:

> 5 Corbin on Contracts, § 1029, provides as an alternative measure of damages where the profits presented are too uncertain:
>
> "Where it is clear that the defendant's breach of contract has prevented the plaintiff from making profits the amount of which cannot be proved with reasonable certainty, it should be remembered that this situation has been brought about by the wrongful conduct of the defendant. He should not be allowed to escape by merely paying nominal damages if there is any reasonable way in which the amount that he should pay as damages can be determined. There are a few alternative rules for determining this amount. Their purpose is to make compensation for the profits prevented and losses caused, measuring the amount by a method that is reasonably definite, and that is not likely to give compensation in excess of the profits that would have been made, and the losses that have been suffered. Thus, where the breach by the defendant has prevented the use and operation of property by the plaintiff from which use profits would probably have been made, the damages to be recovered may be measured by the rental value of the property, or by interest on the reasonable value of the property as an investment."

There appears no reason why the liberal view as to damages for contract breach expressed in Laas, should not also apply to tort actions. We are not, as Laas suggests, in tort actions required to turn to the reasonable rental value of the property, nor to the interest it would have gained as an investment, because the action of the Bank's agent here destroyed those values.

As we indicated in the foregoing statement of facts, before the plaintiffs got involved with the Bank in this case, but after the ditch washout of May 20, 1978, the shareholders nevertheless had a project of value which they could sell. In fact they had placed the project on the market at the same time as they were seeking refinancing through the FmHA and were required to desist from attempting to sell the project because of FmHA regulations. Irrespective of the washout, it was the investment of the shareholders in the corporation that have brought about whatever value the project had after the washout. Any attempt by the District Court to fix a value on the project after the washout would have of course been speculation. The District Court therefore, recognizing that damages had occurred, and that the plaintiffs were entitled to damages, resorted to the known figures that the evidence presented, that is the investment that had been made by the original shareholders. In the situation that presented itself to the District Court--the lack of any other certain way to fix the plaintiffs' damages--the District Court in this case acted properly and reasonably in determining that the damages suffered by the plaintiffs was the amount of their investments in the project at the time the Bank entered the picture. Through its subsequent tortious acts the Bank brought about the demise of the project as a financial venture. We find that the District Court acted properly in this regard.

COMPARATIVE FAULT

The Bank argues that the District Court erred in failing to compare Wallander's conduct with that of the CSTC principals. It contends the depiction of the trout farm's

- 13 -

commercial success as represented to Wallander in the feasibility study prepared by Tom Nyquist and Ron Preston was an equally misleading attempt to deceive Wallander and the Bank into financing the enterprise.

However, the District Court found Wallander's conduct "malicious" and "oppressive," such that it precluded any comparative negligence on the plaintiffs' part. The court noted plaintiffs' inexperience in the business of trout farming, but did not find this inexperience rose to the level of Wallander's fraudulent misrepresentations.

Montana's comparative negligence statute does not contemplate a comparison between ordinary negligence and willful or wanton misconduct. Derenberger v. Lutey (Mont. 1983), 674 P.2d 485, 487, 40 St.Rep. 902, 904. In this case, there was no finding of negligence on the plaintiffs' part at all. The District Court noted in detail the CSTC principal's lack of sophisticated technical and business expertise, but also noted that despite the bleak testimony of the Bank's trout farm expert, the potential of establishing a successful trout farm was not beyond their reach. The principals of CSTC did hire an accountant, an appraiser and an engineer to assist them in making their business decisions. While taking on the responsibility of a new high-risk business such as trout farming by inexperienced entrepreneurs may have been imprudent, such an action did not rise to the level of negligence. On the other hand, the actions of Jerry Wallander added up to much more than ordinary negligence:

> 1. Misrepresenting to a borrower a bank's lending ability as that ability may be enhanced by the overlining of another bank.

2. Representing there would be "no problem" in obtaining overline support from another bank without having inquired of that bank.

3. Failing to advise a prospective overline bank of the existence of a FmHA conditional commitment for permanent financing when seeking construction or interim funds for a borrower in excess of the lender's lending limit.

4. Lying to a borrower about negotiations or commitments for interim financing, or about securing those commitments.

5. Withdrawing an assured line of credit without cause on the part of the borrower.

We find no legal error in the District Court's precluding consideration of comparative negligence on the part of the plaintiffs, where there is insufficient evidence in the record to indicate any negligent action on the part of the plaintiffs.

PUNITIVE DAMAGES

In this case, Wallander and the Bank not only owed CSTC and its shareholders the duty to fulfill its obligation to advance interim financing money, but also the duty to truthfully apprise the investors of the status of the financing. Investors have a right to rely on a lending institution's representations as to the availability of funds. Where in addition the institution fraudulently or maliciously represents that funds are available and will be advanced, and begins a series of cash advancements to finance a project, investors may recover punitive damages for their good faith reliance on the fraudulent misrepresentations.

The District Court found that Wallander, as the Bank's agent, engaged in "a studied and extended course of

- 15 -

fraudulent misrepresentation . . . unjustified by any circumstance and 'malicious' and 'oppressive' within the meaning of those terms as applied in the law of torts." Punitive damages are properly awarded where there is a sufficient showing of fraud and misrepresentation. Castillo v. Franks (Mont. 1984), 690 P.2d 425, 430, 41 St.Rep. 2071, 2077. We uphold the District Court's award of punitive damages.

AWARD OF CSTC'S LIABILITIES

After awarding damages to CSTC and its shareholders, the District Court awarded to the Bank all of CSTC's property except for a mobile home, as an offset to the damages awarded to the plaintiffs. The property included equipment, buildings, ditches, and leases to water and state land. The leases were subject to lease payments, reclamation costs and property taxes. The Bank contends this award of assets not listed as collateral in the Bank's security agreement violates its secured creditor rights under the Uniform Commercial Code. The Bank argues that under §§ 30-9-501 through -511, MCA, it is entitled to a variety of options in enforcing its security interest, and it may not be forced to satisfy its claim by taking possession of the property.

In its final judgment of June 18, 1985, the District Court cancelled all of the promissory notes from CSTC to the Bank. These six notes were ones which were given by CSTC and co-signed by the CSTC principals in reliance on Wallander's misrepresentations as to the availability of interim financing. By cancelling the promissory notes, the court erased the Bank's specific security interests.

Under § 30-1-103, MCA, the Uniform Commercial Code may be supplemented by principles of law and equity, including

the law relative to fraud and misrepresentation. Based on Wallander's misrepresentations and the plaintiffs' reliance thereon, we find the court did not abuse its discretion in cancelling the promissory notes.

Having cancelled the notes, the court, sitting in equity, had a great deal of leeway in fashioning a remedy. Link v. State, Dept. of Fish and Game (1979), 180 Mont. 469, 483, 591 P.2d 214, 222. The District Court properly selected a damage award which gave the Bank certain benefits and options which would otherwise have been unavailable if the award against the Bank merely had been for money damages, without allowing for an offset. The remedy chosen by the court allowed the Bank to mitigate its losses. We find no error in the court's choice of remedy.

THE AWARD OF INTEREST

The Bank argues that the District Court awarded interest on the CSTC shareholders' investments from the date of their initial investments. This is a misstatement of the District Court's final judgment. While the District Court first awarded interest to shareholders from the date of their initial investments, this award was modified in the final judgment of June 18, 1985.

The District Court has awarded interest on each shareholders' investment from January 28, 1985--the date the findings of fact and conclusions of law were entered. This is the date the court fixed the amount of damages, and interest is recoverable when the amount of damages is made certain by the trial court. Section 27-1-211, MCA; Castillo v. Franks (Mont. 1984), 690 P.2d 425, 431, 41 St.Rep. 2071, 2078; Carriger v. Ballenger (Mont. 1981), 628 P.2d 1106, 1110, ___ St.Rep. ___. Therefore, arguments by the Bank and

- 17 -

plaintiffs as to the propriety of prejudgment interest are moot.

ADEQUACY OF THE AWARD TO CSTC

On cross-appeal, plaintiffs argue the District Court's judgment should be increased to include three more elements of damages. They are:

1. Damages done to CSTC, destroying its economic life and solvency;

2. Salaries earned and owing to Ron Preston and Ken Nyquist from August, 1979, to April, 1981;

3. General damages for the disruption of credit, loss of job opportunities, general humiliation and embarrassment, and the overall mental pain and anguish suffered by Ken Nyquist, Tom Nyquist and Ron Preston.

Plaintiffs argue the District Court failed to address the value of the corporation, despite Ken Nyquist's and Ron Preston's testimony that CSTC had a value of $3,000,000 to $6,000,000. They argue that an owner may properly express his opinion as to the value of his property. They also contend loss of salaries and the general damages listed above were foreseeable results of the Bank's failure to provide funding for CSTC, and as such, the District Court should have awarded these damages to plaintiffs.

In order to recover consequential damages for breach of contract, the nature and origin of the damages must be established with reasonable certainty. Ehly v. Cady (Mont. 1984), 687 P.2d 687, 695, 41 St.Rep. 1611, 1619; Stensvad v. Miners & Merchants Bank (1982), 196 Mont. 193, 206, 640 P.2d 1303, 1310. The District Court found that an estimation of CSTC's future financial success or failure called for "an impermissibly large measure of pure speculation." The court heard testimony from expert witnesses on both sides, and was presented with "a veritable blizzard of facts, figures and

- 18 -

exhibits" intended to demonstrate the nonviability of the trout farming enterprise. Neither side succeeded in convincing the court that CSTC was either doomed to failure or bound for unqualified success. Under these facts, the court properly rejected the plaintiffs' request for damages to CSTC's economic life, where evidence of CSTC's future success was tenuous at best.

For similar reasons, the court's rejection of plaintiffs' claim for lost salaries for the period of August, 1979, to April, 1981, was also proper. Since the plaintiffs failed to establish the future profitability of CSTC, an award of future salaries would also be overly speculative. We also find insufficient evidence on which to reverse the District Court's denial of general damages to Ken Nyquist, Ron Preston and Tom Nyquist. Plaintiffs have not established to the satisfaction of the Court a clearly ascertainable standard by which to measure these alleged losses.

The judgment of the District Court is reversed and remanded for the District Court to enter the same judgment against Jerry B. Wallander, and is affirmed as to the award of damages.

John L. Sheehy
_____
Justice

We Concur:

_____
Chief Justice

_____

- 19 -

_____

_____

_____

William E. Hewitt Sr.
Justices

Mr. Justice Frank B. Morrison, Jr. dissents as follows:

I respectfully dissent from the majority opinion on the damage issue.

The trial court was faced with a difficult decision respecting an award of damages in this case. The proper measure of damages required the District Court to evaluate the value of this business after the "wash out" and compare that value to a value for the business had the funds been advanced. The difference in values should be the measure of damage. The investment of the individual plaintiffs is not the correct measure of damages.

The trial court faced the difficult task of determining damages in the absence of proof relating to the proper measure. Since the plaintiffs were represented by able and experienced trial counsel I can only assume that it was virtually impossible to establish the appropriate values with expert testimony. Nevertheless, the burden of proof on damages resides with the plaintiff and if there is a failure the plaintiff's case must fall.

I would reverse and remand this case for a new trial on damages requiring the plaintiff to go forward with proof relating to the change in value caused by the bank's failure to advance funds.

_____
Justice

Mr. Justice Fred J. Weber and Mr. Justice L. C. Gulbrandson:

We concur in the foregoing dissent of Mr. Justice Morrison.

_____
Justice

_____
Justice