

DA 07-0243

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 331

LESTER E. AMMONDSON, CATHERINE COUTURE
(as surviving spouse of James W. Couture),
SHERWOOD CHRISTENSEN, W. STEPHEN DEE,
CHARLES GUILDER, JOHN A. LAHR, EDMOND
MAGONE, ELMER MELDAHL, JOHN S. MILLER,
ROGER L. RAWLS, C. DANIEL REGAN, ALLEN T.
SMITH, GEORGE A. THORSON, JOHN B. VAN GELDER,
and WILHELMUS C. VERBAEL,

        Plaintiffs and Appellees,

    v.

NORTHWESTERN CORPORATION, and GARY G.
DROOK, MICHAEL J. HANSON, ROGER P. SCHRUM,
KEITH KOVASH, and KENDALL G. KLIEWER, all as
individuals and as corporate officers of Northwestern Corporation,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Second Judicial District,
                In and For the County of Silver Bow, Cause No. DV 2005-097
                Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                John Alke, Elizabeth S. Baker, Hughes, Kellner, Sullivan & Alke, PLLP,
                Helena, Montana

                W. Wayne Harper, Attorney at Law, Butte, Montana

        For Appellees:

                A. Clifford Edwards, Triel D. Culver, Edwards, Frickle, Anner-Hughes
                & Culver, Billings, Montana

Submitted on Briefs:  July 15, 2009

Decided:  October 13, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Defendants Northwestern Corporation (Northwestern), Gary G. Drook (Drook), Michael J. Hanson (Hanson), Roger P. Schrum (Schrum), Keith Kovash (Kovash), and Kendall G. Kliewer (Kliewer) (collectively Defendants), appeal from a jury verdict rendered against them in the Second Judicial District Court, Silver Bow County. The jury awarded the plaintiffs approximately $17.5 million dollars in compensatory damages, and $4 million dollars in punitive damages based on a claim for breach of contract, and the torts of breach of the covenant of good faith and fair dealing, abuse of process, and malicious prosecution. We affirm the jury's verdict.

## PROCEDURAL AND FACTUAL BACKGROUD

¶2    Lester E. Ammondson (Ammondson), Sherwood Christensen (Christensen), W. Stephen Dee (Dee), Charles Gilder (Gilder), John A. Lahr (Lahr), Edmond Magone (Magone), Elmer Meldahl (Meldahl), John S. Miller (Miller), Roger L. Rawls (Rawls), C. Daniel Regan (Regan), Allen T. Smith (Smith), George A. Thorson (Thorson), John B. Van Gelder (Van Gelder),  Wilhelmus C. Verbael (Verbael), and James Couture (Couture)[1] (collectively Retirees), were all former employees of the Montana Power Company (MPC), a Montana-based public utility company. These individuals had been employed with MPC for periods ranging from 3 to 40 years. Each of these plaintiffs left MPC after entering into separate agreements with MPC which provided them monthly payments to supplement their regular retirement plans. The agreements were known as "Top Hat Contracts," a term derived from the Employee Retirement Income Security Act.

---

[1] Catherine Couture, the surviving spouse of James Couture, represented him in this suit.

The combined value of these individual Top Hat Contracts was approximately $2.9 million dollars.

¶3 Northwestern is a Delaware corporation that currently operates as a public utility in Montana. In 2002, Northwestern purchased MPC's transmission and distribution assets. Northwestern hired the law firm of Paul, Hastings, Janofsky & Walker, LLP (Paul Hastings) to facilitate the purchase. In the course of its purchase of MPC, Northwestern assumed responsibility for the Top Hat Contracts in a unit purchase agreement (UPA), which specifically stated that Northwestern would maintain and be responsible for all current and future obligations of MPC as they related to any supplemental pension benefit or benefit replacement restoration plan, program, or individual agreement which had been maintained by MPC.

¶4 In September 2003, Northwestern filed for Chapter 11 reorganization in United States Bankruptcy Court in the Federal District of Delaware. The Paul Hastings law firm continued to provide Northwestern with legal representation during this time. When it filed for bankruptcy, Northwestern had several thousand potential creditors. In bankruptcy proceedings, Northwestern reviewed the contracts held by these creditors to determine if it would assume or reject them. If the contracts were assumed, their terms would be honored; if they were rejected, then the holders of those contracts would become general unsecured creditors and likely receive general, unsecured stock in the reorganized Northwestern. Northwestern did not provide notice to the holders of the Top Hat Contracts that it would reject their contracts during bankruptcy and seek to treat them as general, unsecured creditors. Instead, Northwestern continued to pay the Retirees

4

under the terms of the Top Hat Contracts throughout bankruptcy proceedings in Delaware.

¶5 On October 19, 2004, the bankruptcy court confirmed Northwestern's Chapter 11 bankruptcy reorganization plan (Plan). The effective date of the Plan was November 1, 2004, at which time Northwestern officially emerged from bankruptcy as a reorganized entity. On December 30, 2004, Northwestern filed a notice of substantial confirmation of the Plan in Federal District Court in Delaware.

¶6 On January 1, 2005, Northwestern, without giving any prior notice to any of the Retirees, ceased making payments to them under the Top Hat Contracts.[2] Although some of the Retirees immediately contacted Northwestern in an attempt to discover why their payments had stopped, Northwestern failed to provide them with any answers. On January 26, 2005, Kovash, who was Northwestern's director of benefits, informed the Retirees in writing that it had discontinued payment under their Top Hat Contracts in connection with its plan of reorganization. Furthermore, Northwestern advised the Retirees that it anticipated filing a motion in bankruptcy court to terminate the Top Hat Contracts and that upon receipt of the motion, the Retirees should contact a legal advisor.

¶7 On January 31, 2005, Northwestern filed a motion to terminate the Top Hat Contracts in bankruptcy court in the Federal District of Delaware. After the filing of the motion in bankruptcy court, the Retirees were able to obtain Montana counsel, the Edwards Law Firm of Billings, to represent them in this matter. The Edwards Law Firm

---

[2] Of all the plaintiffs in this case, only Van Gelder was listed in bankruptcy proceedings as a party to an executory contract. However, Van Gelder, like all the other plaintiffs, was never given any notice that Northwestern intended to terminate his Top Hat Contract.

in turn hired local counsel in Delaware to represent the Retirees in federal bankruptcy court. On March 31, 2005, the Retirees filed an objection and response to Northwestern's motion to terminate the Top Hat Contracts. The Retirees sought to have Northwestern's motion dismissed on the grounds that the bankruptcy court did not have jurisdiction to entertain the motion since none of the Retirees had been listed as secured or unsecured creditors prior to Northwestern's reorganization during bankruptcy proceedings. Additionally, the Retirees counterclaimed against Northwestern for breach of contract, breach of the covenant of good faith and fair dealing, and abuse of process.

¶8 On March 31, 2005, the Retirees also filed a claim for compensatory and punitive damages against Northwestern, Drook, Hanson, Schrum, Kovash, and Kliewer in the Second Judicial District Court, Silver Bow County. This state complaint was later amended to add Paul Hastings as a defendant based on its actions in advising Northwestern in federal bankruptcy court proceedings against the Retirees. In the state complaint, the Retirees alleged that these defendants had committed breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contracts, abuse of process, and fraudulent conduct, by virtue of their actions in stopping payment under the Top Hat Contracts without notice, and then filing a motion to terminate those contracts in bankruptcy court after Northwestern had already finalized its reorganization under Chapter 11. The day prior to filing the state complaint, counsel for the Retirees notified Northwestern's counsel in writing as to the contents of the complaint and its intent to file suit in Montana, but also stated that he would hold off on serving the

6

complaint on Northwestern until the bankruptcy court in Delaware had an opportunity to rule on the Retirees' response to Northwestern's motion to terminate.

¶9 On April 25, 2005, Northwestern filed a complaint against the Retirees in federal bankruptcy court in Delaware. In the complaint, Northwestern named itself as a plaintiff, and each of the Retirees as defendants. Contemporaneously, Northwestern also filed a motion for an order to show cause against the Retirees, and sought a preliminary injunction against their action in state court in Montana. Pursuant to Northwestern's motion, the Delaware federal bankruptcy court, Hon. John L. Peterson presiding, issued an order to show cause against the Retirees, and stayed all state court proceedings until the bankruptcy court could rule on the matter.

¶10 On May 3, 2005, Judge Peterson held a hearing on the pending motions and complaint before the bankruptcy court. Both Northwestern and the Retirees were represented by counsel, with some of the Retirees flying from Montana to attend the proceedings. The next day, Judge Peterson issued his ruling, dismissing Northwestern's motion to terminate and concluding that the bankruptcy court was without jurisdiction to entertain Northwestern's motion. In his written order, Judge Peterson noted that on December 30, 2004, Northwestern had filed a notice with the bankruptcy court of "substantial consummation of the Plan, meaning all matters required to be done under the Plan, and pursuant to the Plan, had been accomplished. Nowhere are the claims of the [Retirees] recognized as affecting consummation or implementation of the Plan." Judge Peterson further observed that specific language in the confirmed Plan contemplated that any disputes relating to issues concerning contractual and fiduciary duties owed by

7

Northwestern to other parties (such as the Top Hat Contracts and corresponding duties owed to the Retirees by Northwestern) would be resolved in a forum outside of federal bankruptcy court. Third, Judge Peterson noted that under the Plan Northwestern was required to make appropriate filings in bankruptcy court if it wished to reject any executory contracts during bankruptcy proceedings—a provision with which Northwestern obviously failed to comply since it did not give any notice to the Retirees until after it emerged from Chapter 11 as a reorganized entity. Reflecting on this fact, Judge Peterson then held as follows:

> The single fact of the matter is quite significant. None of the [Retirees] were afforded due process, in that none were served with rejection notices of their executory contracts in accordance with [Northwestern's] Plan, even though, alarmingly, [Northwestern], in its Motion to terminate the pension benefits, acknowledged the MPC purchase agreement . . . as to the pension agreements "constitutes a legal, valid and binding agreement, enforceable in accordance with its terms of MPC" that [Northwestern] "shall maintain and shall be responsible for . . . all current and future obligations of MPC . . . under any supplemental pension benefit or benefit replacement or restoration plan, program or individual agreement maintained by MPC . . . ." The Motion then correctly asserts that "no individual who is a party to an MPC agreement has filed a proof of claim against the Debtor." Yet, [Northwestern] now wants to reject each individual agreement that it assumed and became liable to pay, at this late date, beyond the bar date [Northwestern] established in the Plan, as an executory contract, where, absolutely no notice or pleading was ever served upon any of the [Retirees] prior to confirmation. . . .
>
> Simply stated, these [Retirees] have not been afforded due process, by notice, or any other form in the [Northwestern] Plan reorganization effort. To now cast upon each of the [Retirees] a jurisdictional premise before this Court in light of the above is simply beyond any standard of timely fairness and notice, which this Court cannot tolerate or condone.

¶11 Taking notice of the fact that the Retirees had filed a complaint in state District Court, Judge Peterson held there was no jurisdiction over the Top Hat Contracts in

federal bankruptcy court, and deemed that in the interests of justice the bankruptcy court would abstain in favor of the state court action in Montana. Northwestern subsequently filed an appeal from Judge Peterson's ruling, but then voluntarily dismissed that appeal at a later date.

¶12 Once the matter was returned to the Second Judicial District Court, the Retirees sought a jury trial on their claims and the parties went through an extensive motion practice prior to trial. In November 2005, Northwestern resumed paying the Retirees pursuant to their Top Hat Contracts, and paid them back payments due with interest. Prior to trial, Paul Hastings settled with the Retirees for an undisclosed amount and was subsequently dismissed from the suit.

¶13 Prior to and during trial, the District Court issued rulings related to the availability of certain defenses to Northwestern, the admissibility of evidence, Northwestern's motions for judgment as a matter of law on some of the Retirees' claims, and the jury instructions. As necessary, we will discuss the District Court's rulings on these issues below. The jury trial began on February 12, 2007, and concluded with a jury verdict in the Retirees' favor on February 22, 2007. During the course of the trial, the jury heard from the Retirees, as well as Catherine Couture, testifying about their involvement in these events and how they were emotionally and mentally impacted by the actions of the Defendants. The jury also heard, either through live testimony or deposition, from the individually named defendants, Paul Hastings' attorneys, Ford Elsaesser (Elsaesser), a qualified expert on bankruptcy law, Wade Dahood (Dahood), a Montana attorney who

9

was qualified to render an expert opinion on the Defendants' and Paul Hastings' conduct, and an economist presented by the Retirees in support of their claims for damages.

¶14 Through the testimony of these various witnesses and numerous documents (including many of the internal communications among Northwestern, Paul Hastings, and their agents, employees, and officers), the jury was presented with two different versions of the events surrounding the termination of the Top Hat Contracts and the initiation of proceedings against the Retirees in federal bankruptcy court. The Retirees portrayed the Defendants' actions as a course of illegal and malicious conduct directed against them. They asserted that Northwestern's general counsel, Thomas Knapp (Knapp), ordered the termination of the contracts and filings in bankruptcy court against the legal advice of Paul Hastings, whose attorneys had opined that this course of action was not legally supportable. The Retirees claimed that Northwestern and its counsel knew that the Top Hat Contracts were valid and binding, yet went on to represent to the federal bankruptcy court the opposite. Furthermore, the Retirees argued that the economic cost of the Top Hat Contracts was to be borne by the rate payers, and not Northwestern directly, and that it was disingenuous for Northwestern to represent to the bankruptcy court that terminating the contracts was in the best interests of the corporation; yet, in the face of this evidence, Knapp, Northwestern, and its officers and agents, moved to terminate the Top Hat Contracts and initiate proceedings against the Retirees in federal bankruptcy court.

¶15 In this connection, the Retirees presented testimony from Dahood and Elsaesser to support their argument that the bankruptcy proceedings and related actions were without

legal basis. Dahood also testified about the costs incurred by the Retirees in defending against the Defendants' claims. Elsaesser opined that an affidavit signed by Kovash, wherein he represented to the bankruptcy court that the Top Hat Contracts were not valid, legal, or binding agreements, was a false and misleading statement made to the bankruptcy court. Additionally, Elsaesser testified that a sworn declaration filed by Kliewer, Northwestern's controller, wherein he claimed that the Retirees were unsecured creditors, was an absolutely false statement and another misrepresentation to the bankruptcy court.

¶16 As to the corporate decision to terminate the Top Hat Contracts and commence litigation in bankruptcy court, the Retirees presented evidence and argument to support their claims that these actions were tortious in nature as well. They argued that the bankruptcy court filings and other actions taken by Northwestern against the Retirees, were done with the intent to make them accept a settlement more favorable to Northwestern. The Retirees argued that Northwestern sought to leverage them into giving up their legitimate claims under their contracts and instead accept shares of stock in the newly reorganized Northwestern corporation—an action which none of the Retirees wished to take. In this connection, the Retirees presented evidence concerning the participation of Drook, Hanson and Schrum in the corporate decisions to terminate the Top Hat Contracts and initiate what the Retirees term Northwestern's "malicious lawsuit" in bankruptcy court. The Retirees claim that these decisions, and the acts of the individual defendants in performing them, constituted tortious conduct for which both Northwestern, and the individual defendants, could be held liable.

¶17    The Defendants, by contrast, painted these events as actions taken in the best interests of Northwestern without any malice or tortious intent towards the Retirees. Northwestern claimed that the Top Hat Contracts were among many other non-qualified benefit plans that its financial and legal advisors reviewed during bankruptcy in order to evaluate their administrative costs and value to the corporation. Northwestern admits that it terminated the Top Hat Contracts without timely notice to the Retirees, but asserted that this action, and the subsequent related proceedings in bankruptcy court, did not amount to tortious conduct against the Retirees. Instead, it basically argued that its mistake was in the timing of its decision to terminate the contracts, and its failure to provide proper notice. Northwestern further pointed out that it resumed payments to the Retirees in November 2005, and paid them back payments with interest. Through the testimony of Judge Peterson, counsel for Paul Hastings, Knapp, Kovash, and Kliewer, the Defendants presented this defense against the Retirees' claims.

¶18    In its verdict rendered on February 22, 2007, the jury found Northwestern liable for breach of contract, the tort of bad faith breach of contract, abuse of process, and malicious prosecution. It also found Northwestern liable for punitive damages. With respect to the individual defendants Drook, Hanson, Schrum, Kovash, and Kliewer, the jury found them liable only for abuse of process and malicious prosecution, and not liable for punitive damages. The jury further found the Defendants collectively not liable on the tortious interference of contract claims. As a result of the verdict, the jury awarded the Retirees as a whole approximately $17.5 million dollars in compensatory damages, with individual amounts apportioned to each individual Retiree. The following day the

12

punitive damages phase of the trial was held, and the same jury returned a verdict of $4 million dollars in punitive damages against Northwestern.

¶19   Judgment was entered by the District Court on March 5, 2007.   After the judgment, the Defendants filed various post-trial motions seeking to offset the damages against the pre-trial settlement entered into by Paul Hastings, and also seeking to reduce the judgment by the amount of the ongoing payments Northwestern was still making to the Retirees.  These motions were denied by the District Court.

¶20   The Defendants now appeal the jury's verdict, as well as various rulings of the District Court before, during, and after trial.  We state the issues presented by their appeal as follows:

¶21   **Issue One**:   *Were the Retirees' claims completely preempted by federal bankruptcy law and did the District Court lack subject matter jurisdiction to consider those claims?*

¶22   **Issue Two:**  *Did the District Court err by denying the Defendants the opportunity to present an advice-of-counsel defense to the Retirees' claims?*

¶23   **Issue Three:**  *Did the District Court err in denying the Defendants' motion for judgment as a matter of law on the Retirees' abuse of process claim?*

¶24   **Issue Four:**  *Should the judgment on the Retirees' bad faith claim be reversed?*

¶25   **Issue Five:**  *Did the District Court commit reversible error in allowing the jury to consider the Retirees' claims for emotional distress and instructing them on those claims?*

13

¶26     **Issue Six:**  *Was the jury's verdict awarding tort damages supported by substantial credible evidence?*

¶27     **Issue Seven:**  *Did the District Court err in denying the Defendants' motions for dismissal and judgment as a matter of law as to defendants Drook, Hanson, Schrum, Kovash, and Kliewer?*

¶28     **Issue Eight:**  *Did the District Court err in denying the Defendants' post-trial motion to offset the judgment against the amount of the Retirees' pre-trial settlement with Paul Hastings?*

### STANDARD OF REVIEW

¶29     We review a district court's conclusions on questions of law to determine if those conclusions are correct.  *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 28, 338 Mont. 259, 165 P.3d 1079.

¶30     We review jury instructions for an abuse of discretion to determine whether, as a whole, they fully and fairly instruct a jury on the law applicable to the case.  *State v. English*, 2006 MT 177, ¶ 39, 333 Mont. 23, 140 P.3d 454.  We review a district court's grant or denial of a motion in limine for an abuse of discretion as well.  *State v. Dunning*, 2008 MT 427, ¶ 21, 347 Mont. 443, 198 P.3d 828.  A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice.  *Dunning*, ¶ 21.

¶31     We review a jury's decision to determine if substantial credible evidence in the record supports it.  *Upky v. Marshall Mountain, LLC*, 2008 MT 90, ¶ 22, 342 Mont. 273, 180 P.3d 651.  "Substantial evidence is 'evidence that a reasonable mind might accept as

14

adequate to support a conclusion' and may be less than a preponderance of the evidence but must be more than a 'mere scintilla.' " *Upky*, ¶ 22 (quoting *Campbell v. Canty*, 1998 MT 278, ¶ 18, 291 Mont. 398, 969 P.2d 268).

¶32   We review de novo a district court's decision to deny a motion for judgment as a matter of law. *Vader v. Fleetwood Enterprises, Inc.*, 2009 MT 6, ¶ 20, 348 Mont. 344, 201 P.3d 139. Judgment as a matter of law is appropriate only when there is a complete absence of any evidence which would justify submitting an issue to a jury. *Vader*, ¶ 20.

## DISCUSSION

¶33   **Issue One**:   *Were the Retirees' claims completely preempted by federal bankruptcy law and did the District Court lack subject matter jurisdiction to consider those claims?*

¶34   The Defendants raise a novel issue for the first time on appeal, arguing that the District Court proceedings in this case were completely preempted by federal law, and that the District Court lacked subject matter jurisdiction to entertain them. Although this issue has not been previously raised or pled as an affirmative defense during the course of these proceedings, the Defendants nonetheless argue that it merits consideration because challenges to subject matter jurisdiction may be raised at any time, including for the first time on appeal.

¶35   While we agree with the Defendants that challenges to subject matter jurisdiction *may be* considered for the first time on appeal, *see Stanley v. Lemire*, 2006 MT 304, ¶¶ 29-32, 334 Mont. 489, 148 P.3d 643, given the procedural posture of this case and the previous rulings by the federal bankruptcy court, we find this argument wholly devoid of merit.   Judge Peterson specifically found that the federal bankruptcy court lacked

15

jurisdiction under federal bankruptcy laws over Northwestern's motion to terminate since Northwestern's bankruptcy plan had already been consummated. In fact, Judge Peterson went so far as to characterize Northwestern's attempt to invoke the federal jurisdiction of the bankruptcy court as "simply beyond any standard of timely fairness and notice, which this Court cannot tolerate or condone."

¶36 Northwestern initially appealed this ruling, but then apparently dismissed its appeal of its own accord. Now, several years later, the Defendants ask this Court to return jurisdiction to the very federal court which has already determined that it lacked jurisdiction, thus leaving the Retirees' claims in a legal limbo with federal and state courts both refusing to exercise jurisdiction over these claims. The implications of this argument defy common sense and logic, and are nothing short of Kafkaesque.

¶37 Additionally, it is patently obvious that Northwestern is collaterally estopped from asserting a federal jurisdiction argument at this stage in the proceedings since the issue of federal jurisdiction was already decided by Judge Peterson, and Northwestern was party to this prior, final adjudication. *See Auto Parts of Bozeman v. Employment Relations Div. Underinsured Employers' Fund*, 2001 MT 72, ¶¶ 29-30, 305 Mont. 40, 23 P.3d 193. Thus, we reject this argument.

¶38 **Issue Two:** *Did the District Court err by denying the Defendants the opportunity to present an advice-of-counsel defense to the Retirees' claims?*

¶39 Throughout bankruptcy proceedings and the decision-making process on whether to file a motion to terminate the Top Hat Contracts in bankruptcy court, Northwestern was represented by the law firm of Paul Hastings. In the Retirees' complaint, they

16

alleged that Defendants' actions were done with the assent and assistance of Northwestern's agent Paul Hastings, and resulted in the commission of various torts against the Retirees.

¶40    In its response to these claims, the Defendants presented a general denial, but did not plead advice of counsel as an affirmative defense. Prior to trial, the Defendants proposed the following jury instruction:

> Montana law provides that reliance upon the advice of counsel, provided in good faith and based upon a full and fair statement of the facts by the client, is a complete affirmative defense to an action for malicious prosecution.

¶41    On the morning of trial, the Retirees orally presented to the District Court a motion in limine seeking to preclude Northwestern from presenting the affirmative defense of reliance on advice of counsel at trial.[3]    The Retirees argued that the Defendants could not present such a defense since they did not affirmatively plead it in their responsive pleadings.  The Defendants argued against the Retirees' motion.  The District Court did not make a definitive ruling on the motion at that time.

¶42    On February 16, 2007, during the Retirees' case-in-chief, but before the Defendants presented their defense, the District Court entertained further argument on the Retirees' motion.  The Retirees argued that the Defendants could not present this defense

[3] In a previous motion for summary judgment, the Retirees had sought to preclude the Defendants from raising any affirmative defenses based on the propriety of Paul Hastings' conduct in federal bankruptcy court.  The Retirees asserted that Judge Peterson had essentially ruled on the propriety of Paul Hastings' conduct in the bankruptcy action when it dismissed that action and returned jurisdiction over the Retirees' claims to state court in Montana.  The District Court denied the motion at the time, holding that there remained genuine issues of material fact on Paul Hastings' conduct in bankruptcy proceedings as it related to the Retirees' claims.  However, the District Court had not previously ruled on the extent to which the Defendants could rely upon Paul Hastings' conduct as an affirmative defense to the claims against them.

due to their failure to plead it, and because they had already conceded that they would not be able to assert an "empty chair" defense against Paul Hastings. The Retirees noted that the Defendants had never filed a cross-claim against Paul Hastings at any point in the proceedings. In response, the Defendants asserted that they had not waived the affirmative defense of advice of counsel under the authority of *McGuire v. Armitage*, 184 Mont. 407, 603 P.2d 253 (1979). They asserted that under *McGuire*, the affirmative defense of advice of counsel does not need to be affirmatively pleaded, but instead can be raised in a general denial. The Defendants further asserted that that their reliance on the advice of Paul Hastings was relevant to the issue of causation and intent.

¶43 The District Court issued a ruling that same day, denying in part and granting in part the Retirees' motion. In its written order, the District Court held that the Defendants could not argue to the jury that their reliance on the advice of counsel constituted a valid defense to the Retirees' causes of action, but allowed the Defendants to present evidence as to the substance of Paul Hastings' legal advice. The District Court advanced two grounds for its decision. First, it concluded that the Defendants had failed to raise advice of counsel as an affirmative defense in their response to the complaint as required by the Montana Rules of Civil Procedure. Second, it concluded that Northwestern, as a corporate entity, is held vicariously liable through the acts of its directors, officers, employees and agents, and that it simply could not, as a matter of law, rely on advice of counsel as an affirmative defense, given it is ultimately responsible for the actions of its counsel as an agent of the corporation.

18

¶44 The District Court did conclude that the presentation of evidence as to the substance of Paul Hastings' communication and advice would be permitted as it would go to the heart of the causation and intent elements involved in the tort claims raised by the Retirees. As an example, the District Court noted that claims for punitive damages and malicious prosecution require a showing from the plaintiff that the defendant acted with either actual malice or actual fraud (in the case of punitive damages claims), or that the defendant was motivated by malice (in the case of malicious prosecution). The substance and advice of Paul Hastings' legal counsel would be relevant in helping the jury to assess whether Northwestern or its agents met these mental state requirements. As stated by the District Court,

> The Court concludes that the substance of counsel's communications and advice to the Northwestern Defendants concerning their legal relationship with the Plaintiffs is relevant to the issue of whether the Defendants acted with actual malice or actual fraud in causing harm to the Plaintiffs. The Court also notes that the Plaintiffs' bankruptcy expert witness [Elsaesser] already has testified that he could not find any evidence in the corporate communications where any of the bankruptcy attorneys advised the Northwestern Defendants to stop the supplemental benefit payments to the Plaintiffs. Should communications or advice to the contrary exist, such evidence would go to the credibility of witnesses.

¶45 Furthermore, the District Court noted that it would ultimately instruct the jury that a corporation acts through, and is responsible for, the conduct of its officers, employees, and agents, and that evidence as to the advice of counsel under these circumstances would go towards evaluating Defendants' intent in engaging in the conduct at issue when they acted against the Retirees.

19

¶46    During the settling of jury instructions, the District Court refused the Defendants' instruction on advice of counsel as an affirmative defense on the grounds in its ruling on the Retirees' motion in limine.

¶47    The Defendants now argue that these rulings from the District Court were in error and should be reversed. Relying primarily upon *McGuire*, and *Stephens v. Conley*, 48 Mont. 352, 138 P. 189 (1914), as well as the Montana Rules of Civil Procedure, the Defendants assert that advice of counsel may be raised by a general denial, as was done in this case, and then later be asserted as a complete and affirmative defense. The Defendants argue that the District Court's failure to allow this affirmative defense substantially prejudiced them at trial. When combined with the jury instruction that Northwestern was responsible for the acts of its legal counsel, the Defendants argue that the District Court's rulings effectively amounted to a directed verdict for the Retirees. Furthermore, Northwestern asserts that the evidence it presented supports the argument that it acted in good faith and reliance upon Paul Hastings' advice in filing its motions in bankruptcy court. For these reasons, the Defendants argue that the judgment against them must be reversed and a new trial ordered since the jury was denied the opportunity to consider this defense.

¶48    In response, the Retirees begin by asserting that Northwestern waived the right to present this affirmative defense. They also argue that at the hearing on the motion in limine as well as during the trial, Northwestern basically conceded to the District Court that, under principles of agency law, it would be responsible for the actions of Paul Hastings. In the final pretrial order, Northwestern in fact conceded it could not assert an

20

"empty chair" defense against Paul Hastings, and that Paul Hastings' actions would be probative on the issue of causation for the Retirees' damages. The Retirees also maintain that Northwestern's failure to object to the District Court's jury instruction that it is "responsible for the actions of its directors, officers, employees and agents" further precludes Northwestern from arguing advice of counsel as an affirmative defense under the facts of this case. Finally, the Retirees assert that Northwestern's advice-of-counsel defense was simply not supported by the record, and that Northwestern and the individual defendants in fact disregarded Paul Hastings' legal advice when they took action against the Retirees.

¶49 The Defendants' appeal of this issue presents two separate questions: first, whether the District Court abused its discretion in its order on the Retirees' motion in limine; and second, whether the District Court abused its discretion in denying the proposed jury instruction on the advice-of-counsel defense.

¶50 In *McGuire*, the case relied upon by the Defendants, we stated the following concerning the advice-of-counsel defense:

> Reliance upon the advice of counsel, provided it is given in good faith and is based upon a full and fair statement of the facts by the client, may afford the latter a complete defense to an action for malicious prosecution. But it is an affirmative defense. It may be shown under a general denial in the answer, but *the burden of establishing it is upon the defendant*.

*McGuire*, 184 Mont. at 412-13, 603 P.2d at 256 (emphasis in original, quotation and alterations omitted). Contrary to the Defendants' characterization of *McGuire*, this case did not state unequivocally that advice of counsel is an absolute defense to a claim of

21

malicious prosecution. Instead, *McGuire* recognized that advice of counsel *may* afford a complete defense, provided the defendant satisfies its burden of establishing it.

¶51 In its ruling on the motion in limine, the District Court held that Northwestern was unable to present advice of counsel as an affirmative defense due to its failure to raise it as such in its responsive pleadings as required under M. R. Civ. P. 8(c). *See e.g. Winslow v. Mont. Rail Link, Inc.*, 2005 MT 217, ¶ 38, 328 Mont. 260, 121 P.3d 506. There is simply no question that reliance upon advice of counsel is a matter of avoidance, and this being so, it clearly falls under the clear provisions of M. R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense.").

¶52 In this case, the Defendants did not concede at any point in the litigation that the Retirees may have an otherwise viable cause of action for malicious prosecution—to be averted by the affirmative defense of advice of counsel—as is typical of the classic affirmative defense situation. Rather, they responded in their answer and throughout the litigation with an assertion that they had acted in good faith at all times. Thus, in prohibiting advice of counsel as an affirmative defense, the District Court did not gut the Defendants' case at all, as it permitted the Defendants to fully argue that they acted in good faith and without malice. In other words, the District Court's ruling allowed the Defendants to refute the malicious prosecution claim consistent with the response in their answer—i.e., their general denial of the allegations of malice. *See Stephens*, 48 Mont. at 369-71, 138 P. at 193-94 (discussing the ability of a defendant to rebut a claim of malicious prosecution via general denial); *see also McGuire*, 184 Mont. at 412-13, 603

22

P.2d at 256. Because the Defendants were permitted to present all available evidence showing that they had acted in good faith without malice, including evidence of the substance of Paul Hastings' advice and their actions in relying (or not relying) upon it, they were not at all powerless to defend themselves. Moreover, we agree with the Retirees that the Defendants' concession that they could not assert an "empty chair" defense against Paul Hastings, further undermines their ability to turn around and assert advice-of-counsel as an affirmative defense at trial. Under these circumstances, we therefore conclude that the District Court did not abuse its discretion in its ruling on the motion in limine.

¶53    In the settling of jury instructions, the District Court rejected the advice-of-counsel jury instruction on the same grounds expressed in its ruling on the motion in limine. The denial of this jury instruction did not constitute an abuse of discretion, both in light of the analysis above and because the jury instructions as a whole fairly and full apprised the jury of the applicable law. *English*, ¶ 39. The jury was instructed that in order to prove malicious prosecution, the Retirees had to show, among other things, that the Defendants acted with malice, and that there was no probable cause for their actions. The jury heard the Defendants' evidence and argument that they acted in good faith, but apparently did not find this evidence and argument credible, and concluded that the Retirees had in fact established their claims for malicious prosecution.[4]

---

[4] In this regard, it is worth noting that the Defendants were not prohibited from seeking a jury instruction to expressly inform the jury that a showing of good faith by the Defendants would defeat a claim for malicious prosecution. The Defendants presented evidence and argument that their conduct was in good faith, but did not seek a corresponding jury instruction. Instead, they

¶54 Given the circumstances here presented, we conclude that the District Court did not abuse its discretion in denying the Defendants' proposed instruction on its advice-of-counsel defense, or in its pre-trial and trial rulings related to this defense in the context of the Retirees' claims.

¶55 Additionally, we take this opportunity to prospectively declare that advice-of-counsel, when used as an affirmative defense at trial, must be pled as such under the requirements of M. R. Civ. P. 8(c). In its order, the District Court, citing to *Brown v. Ehlert*, 255 Mont. 140, 841 P.2d 510 (1992), noted that the essence of an affirmative defense is the concession by the defendant that while a plaintiff may have a viable cause of action, liability may be nonetheless avoided by the defendant based on some statute or rule. *See Brown*, 255 Mont. at 146, 841 P.2d at 514. As the Court stated in *Brown*,

> The rationale for requiring that these defenses be affirmatively pleaded is simple: the same principles of fairness and notice which require a plaintiff to set forth the basis of the claim require a defendant to shoulder a corresponding duty to set out not merely general denials as appropriate, but also those specific defenses not raised by general denials by which a defendant seeks to avoid liability, rather than merely to controvert plaintiff's factual allegations.

*Brown*, 255 Mont. at 146, 841 P.2d at 514; *accord, Burns v. A Cash Const. Lien Bond*, 2000 MT 233, ¶ 29, 301 Mont. 304, 8 P.3d 795.

¶56 In challenging the District Court's decision, the Defendants argue that an advice-of-counsel defense can be invoked to positively avoid a claim for malicious prosecution, even if it is not affirmatively pled as required under M. R. Civ. P. 8(c). The legal basis

---

sought only a blanket jury instruction on advice-of-counsel as a complete, affirmative defense that would apply equally both to Northwestern and the individually-named defendants.

for this argument obviously derives from the language in *McGuire* cited above. Opinion, ¶ 50. While a surface reading of this language would suggest that the normal requirements of affirmative defenses under M. R. Civ. P. 8(c) are somehow suspended in the context of malicious prosecution claims, an examination of the authority from which this language in *McGuire* derives demonstrates that this statement is actually a vestige from the days of code pleading, and simply does not trump the well-settled requirements of M. R. Civ. P. 8(c) and controlling case law. *McGuire* relies upon a 1958 case from California, *Masterson v. Pig'n Whistle Corp.*, 326 P.2d 918, 929 (Cal. 1958). The authority for this proposition in *Masterson* finds its ultimate origin in the 1870 case of *Levy v. Brannan*, 39 Cal. 485 (Cal. 1870) as well as *Stephens*, which was decided in 1914.[5] Rule 8(c), and the requirement to affirmatively plead avoidance defenses were adopted in Montana in 1964. Of necessity, M. R. Civ. P. 8(c) would supersede any previous rule of practice from an earlier era which would allow a defendant to invoke a matter of avoidance such as advice-of-counsel as an affirmative defense without pleading it as such.

¶57 We therefore hold that advice-of-counsel, when used as an affirmative defense, must be pled in accordance with M. R. Civ. P 8(c). We therefore expressly overrule *McGuire* to the extent it can be read to the contrary. This rule will apply prospectively to all situations in which a party wishes to rely upon this defense.

¶58 **Issue Three:** *Did the District Court err in denying the Defendants' motion for judgment as a matter of law on the Retirees' abuse of process claim?*

---

[5] *Masterson* relies upon *Walker v. Jensen*, 212 P.2d 569 (Cal. App. 3 Dist 1949), which relies on *Levy* and a few other cases, all of which ultimately derive their authority from *Levy*.

25

¶59 During trial, the Defendants moved for judgment as a matter of law on the Retirees' abuse of process claims, arguing that the Retirees failed to satisfy the elements of this tort insofar as they presented no evidence that the Defendants used legal process to accomplish some collateral goal. As the Defendants correctly observe, abuse of process requires the plaintiff show both "(1) an ulterior purpose and (2) a willful act in the use of process not proper in the regular conduct of the proceeding." *Hughes v. Lynch*, 2007 MT 177, ¶ 21, 338 Mont. 214, 164 P.3d 913 (quotation omitted). Furthermore, in order to support an abuse of process claim, the plaintiff must show that there was "an attempt by the plaintiff to use process to coerce the defendant to do some collateral thing which he could not be legally and regularly compelled to do." *Lynch*, ¶ 21 (quotation omitted). Here, the Defendants claim that such evidence was wholly lacking, and that there was no evidence presented showing that the bankruptcy proceedings were used for any purpose other than to adjudicate the resolution of the Retirees' Top Hat Contracts in bankruptcy court. Accordingly, the Defendants argue there was insufficient evidence to submit this claim to the jury and that their motion for judgment as a matter of law on this claim should have been granted.

¶60 Additionally, the Defendants maintain that the District Court erred in giving the following jury instruction relative to the abuse of process claim: "The filing of a lawsuit in a forum which the party knows to be wrong constitutes an abuse of process." The Defendants assert that this jury instruction is a misstatement of the law, and that it prejudiced them, practically amounting to a directed verdict, by allowing the jury to find

26

them liable based solely on the fact that the bankruptcy court decided to transfer the Retirees' claims back to Montana.

¶61 The Retirees maintain that the District Court did not err in denying this motion or in giving its jury instruction on this claim. With respect to the jury instruction, the Retirees maintain that it was adopted verbatim from *Leasing, Inc. v. Discovery Ski Corp.*, 235 Mont. 133, 765 P.2d 176 (1988), and that it has not been disturbed by subsequent decisions. With respect to the evidence on this claim in general, the Retirees maintain that they provided sufficient evidence to support it. First, they point to evidence presented at trial that Paul Hastings had advised Northwestern that the bankruptcy motions were "legally weak," and that the Top Hat Contracts should have been honored. Second, they assert that Northwestern did in fact use the bankruptcy proceedings in an effort to obtain a collateral advantage against them. In this connection they point to internal communications among Northwestern, its agents, and Paul Hastings obtained during discovery indicating that the bankruptcy motions were devised by Northwestern to gain a tactical advantage over the Retirees, compelling them to be more willing to give up their claims against Northwestern. The Retirees also point out that Judge Peterson found Northwestern's various filings to be wholly without merit, and questioned their legitimacy.

¶62 In order to prevail on a motion for judgment as a matter of law on the abuse of process claim, the Defendants must show "a complete absence of any evidence which would justify submitting an issue to a jury." *Vader*, ¶ 20. The Defendants have failed to carry this burden. The jury was presented with more than sufficient evidence, including

27

internal emails and corporate communications, as well as the testimony of Paul Hastings' attorneys, Northwestern's corporate executive agents, and Judge Peterson himself, upon which to decide the abuse of process claims. While the jury was certainly not required to believe such evidence and testimony, the quantum and quality of such evidence was more than sufficient to survive a motion for judgment as a matter of law.

¶63 Turning to the challenged jury instruction, we conclude that the District Court did not abuse its discretion in giving it. First, we agree with the Retirees that this instruction was an accurate statement of the law under *Leasing, Inc.*, wherein we held that filing a complaint in a forum which a party knows to be improper constitutes an abuse of process. *See Leasing, Inc.*, 235 Mont. at 136, 765 P.2d at 177-78. In that case, one party to a contract dispute filed suit in Granite County which was clearly improper under the plain terms of the contract which required that any contract disputes be handled in Lewis and Clark County. *Leasing, Inc.*, 235 Mont. at 135-36, 765 P.2d at 177-78. Under those circumstances, attempting to resolve the dispute in Granite County constituted an abuse of process.

¶64 In subsequent decisions such as *Lynch* and *Seltzer v. Morton*, 2007 MT 62, 336 Mont. 225, 154 P.3d 561, we have discussed in greater detail the elements and requirements for an abuse of process claim. However, we have never explicitly overruled or abrogated our decision in *Leasing, Inc.* More importantly, both *Seltzer* and *Lynch* were decided *after* the jury proceedings had concluded in this case. Thus, we cannot say it was an abuse of discretion for the District Court to rely upon *Leasing, Inc.* at the time it

28

settled jury instructions in this case. Thus, we affirm the District Court on this issue as well.

¶65    **Issue Four:** *Should the judgment on the Retirees' bad faith claim be reversed?*

¶66    The jury found that Northwestern breached the Retirees' contracts in bad faith. As we stated in *Story v. City of Bozeman*, 242 Mont. 436, 791 P.2d 767 (1990), the tort of bad faith breach of contract applies in "exceptional circumstances." In order to state a claim for bad faith breach of contract in the absence of specific statutory provisions, the plaintiff must show that the parties are in a "special relationship" to one another. To delineate those special relationships, courts are to consider the following elements:

> (1) the contract must be such that the parties are in inherently unequal bargaining positions; [and] (2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection; [and] (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party "whole"; [and] (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability.

*Story*, 242 Mont. at 451, 719 P.2d at 776 (quotation omitted, alterations in original).

¶67    Prior to trial, Northwestern filed a motion to dismiss this claim, arguing that the Retirees had failed to establish a "special relationship" between themselves and Northwestern. The District Court denied the motion, and ultimately instructed the jury on the required elements under *Story*. Northwestern did not object to this jury instruction, move for judgment as a matter of law on this claim, or otherwise seek a new trial based on a failure of evidence to support this claim. Nonetheless, on appeal Northwestern relies upon *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, 297 Mont.

29

33, 991 P.2d 915, and asks this Court to exercise de novo review and conclude that the Retirees presented insufficient evidence to support the finding of a special relationship in this case.

¶68 The Retirees urge us not to consider this argument, since other than filing a pretrial motion to dismiss this claim, Northwestern failed to preserve this issue in the District Court, either during or after trial. We generally refuse to address issues raised for the first time on appeal because it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given an opportunity to consider. *See In re A.C.*, 2004 MT 320, ¶ 16, 324 Mont. 58, 101 P.3d 761. Moreover, we have repeatedly held that failure to object to jury instructions or a verdict form results in a waiver of the right to challenge them on appeal. *Vader*, ¶ 16 (citing *Turk v. Turk*, 2008 MT 45, ¶ 16, 341 Mont. 386, 177 P.3d 1013). Since Northwestern failed to object to jury instructions on the bad faith claim, and did not challenge the sufficiency of the evidence for this claim at the trial level or in post-trial proceedings, we decline to consider this issue now on appeal.

¶69 **Issue Five:** *Did the District Court commit reversible error in allowing the jury to consider the Retirees' claims for emotional distress and instructing them on those claims?*

¶70 In their complaint, the Retirees sought damages based on emotional distress caused by the Defendants' actions. The Defendants responded by moving for summary judgment on those claims. The Defendants argued under *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 896 P.2d 411 (1995), that the Retirees were required to make a showing of "serious or severe emotional distress" in order to recover

30

for emotional distress, and that they had failed to do so. The District Court ultimately denied the motion, holding that the Defendants' reliance on *Sacco* was misplaced because the *Sacco* standard applied only to independent, stand-alone causes of action for negligent/intentional infliction of emotional distress. In this case, the Retirees presented several tort claims and sought recovery for emotional distress as an element of damages arising from those claims. Accordingly, instead of relying on *Sacco*, the District Court relied upon *Johnson v. Supersave Markets, Inc.*, 211 Mont. 465, 686 P.2d 209 (1984) and the 2003 edition of the Montana Pattern Jury Instructions (MPJI) to hold that the proper standard for the emotional distress claims was whether Northwestern's conduct resulted in a substantial invasion of a legally protected interest and caused a significant impact upon the person of the plaintiffs. The District Court therefore denied Northwestern's motion for summary judgment on the emotional distress claims.

¶71 During trial, Northwestern also moved for judgment as a matter of law on the Retirees' emotional distress claims, advancing arguments nearly identical to those set forth in its summary judgment motion. The District Court denied this motion as well.

¶72 During the settling of jury instructions, the District Court rejected several proposed jury instructions which would have required the Retirees to show "serious" or "severe" emotional distress pursuant to *Sacco* in order to prevail on their claims for emotional distress. Instead the District Court gave the following instruction:

> Your award should include reasonable compensation for any mental and emotional suffering and distress experienced by plaintiff and reasonably probable to be experienced in the future.
> Mental and emotional suffering and distress passes under various names, such as mental anguish, nervous shock, or the like. It includes all

highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.

The law does not set a definite standard by which to calculate compensation for mental and emotional suffering and distress. Neither is there any requirement that any witness express an opinion about the amount of compensation that is appropriate for this kind of loss. The law does require, however, that when making an award for mental and emotional suffering and distress, you shall exercise calm and reasonable judgment. The compensation must be just and reasonable.

¶73 The Defendants argue the District Court erred in denying its various motions and instructing the jury on the Retirees' claims for mental and emotional suffering. The Defendants assert that under *Sacco*, the Retirees were required to prove that their emotional distress was "serious" or "severe" in order to present these claims to the jury. Northwestern further argues that under *First Bank (N.A.)—Billings v. Clark*, 236 Mont. 195, 771 P.2d 84 (1989), even derivative emotional distress claims must be severe, and that the Retirees failed to meet this threshold. Northwestern argues that this "severe" standard as articulated in *First Bank* remains relevant, and has been recently affirmed in *Maloney v. Home and Inv. Ctr., Inc.*, 2000 MT 34, 298 Mont. 213, 994 P.2d 1124. The Defendants then recite the evidence relative to each of the Retirees adduced at trial, to demonstrate that the evidence did not meet this threshold. With the exception of Christensen and Van Gelder, the Defendants argue that the remaining Retirees mainly presented evidence of transient and trivial distress typical in the world of business transactions, insufficient to support a claim for mental or emotional distress.

¶74 The Retirees argue that they did in fact meet their evidentiary burden to present these claims to the jury. First, they argue that the *Sacco* standard applies only to

independent negligent/intentional infliction of emotional distress claims, and not to the derivative claims presented in their complaint, and that the District Court gave the correct MPJI on this issue. Additionally, the Retirees argue that under *Seltzer*, this Court addressed the identical issue and held that the *Sacco* standard applies only to independent claims of negligent/intentional infliction of emotional distress, and not to the derivative claims they have presented. Further, the Retirees maintain that they did present evidence of emotional distress suffered by each of them sufficient to support their claims.

¶75 In reply, Northwestern argues that the Retirees' reliance on *Seltzer* is misplaced, that the MPJIs are not themselves the law, and that proper legal authority compels the conclusion that the jury was wrongly instructed.

¶76 We recently addressed this very issue in *Jacobsen v. Allstate Ins. Co*, 2009 MT 248, 351 Mont. 464, ___ P.3d ___, in which we held that the MPJI properly state the threshold required for derivative or parasitic (as opposed to stand-alone) emotional distress claims. *Jacobsen*, ¶ 66. We stated that "the 'serious or severe' standard announced in *Sacco* applies only to independent claims of negligent or intentional infliction of emotional distress." *Jacobsen*, ¶ 66. Furthermore, we explicitly adopted the standards set forth in the MPJIs at issue in the instant case for emotional distress claims as an element of damage of an underlying tort claim (i.e., parasitic emotional distress damages). *Jacobsen*, ¶ 66.

¶77    Pursuant to our holding in *Jacobsen*,[6] we conclude that the Retirees did present sufficient evidence to send their emotional distress claims to the jury and that the District Court did not err in giving its instruction on these claims.  While it is true that the Retirees suffered varying degrees of emotional distress as a result of the Defendants' actions, the quantum of proof as set forth under the MPJI on this claim was satisfied by the evidence they presented.  Therefore, we affirm on this issue.

¶78    **Issue Six:** *Was the jury's verdict awarding tort damages supported by substantial credible evidence?'*

¶79    As noted above, the jury awarded the Retirees approximately $17.5 million dollars in compensatory damages for the Defendants' tortious conduct.  When the jury retired for deliberations, it was given separate verdict forms for each individual plaintiff.  Each verdict form had seven questions.  Question 1 asked if Northwestern breached the particular retiree's contract.  Question 2 inquired whether Northwestern breached that contract in bad faith.  Question 3 asked whether any of the individual defendants tortiously interfered with that particular retiree's contract.  Question 4 inquired whether any of the Defendants committed an abuse of process against that particular retiree.  Question 5 asked whether any of the Defendants committed malicious prosecution against that particular retiree.  If the jury answered yes to questions 1, 2, 3, 4, or 5, it was to determine an amount of money to award that particular retiree for damages caused by the Defendants in Question 6.  Question 7 then asked if any of the Defendants were liable for punitive damages to that particular retiree.  In other words, the verdict form did not

---

[6] *Jacobson* overruled both *First Bank* and *Johnson* regarding this issue.

34

segregate damages based on each of the individual claims against the individual defendants and Northwestern.

¶80 Notably, the Defendants did not object to the verdict form, nor did they seek to have damages apportioned by the jury based on each cause of action or claim. Given that the Retirees presented claims for breach of contract, the tort of bad faith breach of contract, tortious interference with contract, abuse of process, and malicious prosecution, it is simply impossible in retrospect for the Court to determine how or if the jury apportioned damages among those various claims.

¶81 As the Retirees note, we faced a nearly identical situation in *Seltzer*. In that case, a plaintiff brought claims for the torts of malicious prosecution and abuse of process against an out-of-state law firm and other individuals. *Seltzer*, ¶ 1. During trial, the plaintiff presented evidence of emotional distress, harm to his personal and professional reputation, and damages for the expenses he incurred in defending himself. *Seltzer*, ¶ 97. The jury ultimately rendered a multi-million dollar award in his favor. Like the Defendants here, the defendants in *Seltzer* did not request a verdict form which specifically apportioned damages based on the various claims. Nonetheless, on appeal the *Seltzer* defendants challenged whether the jury's award of compensatory damages was supported by substantial credible evidence, and urged the Court to conclude that the jury's award simply represented compensation for emotional distress. *Seltzer*, ¶ 97. In considering this claim, we stated the following:

> The jury's verdict did not designate a separate amount of compensation
> awarded for each of these three elements of damage; it merely listed one
> amount rendered for all compensatory damages. Thus, it is impossible to

know how the jury apportioned the compensatory award with respect to the three elements of damage, and we certainly will not speculate in this regard. Accordingly, we reject the Defendants' assertion that the compensatory award represents compensation solely for emotional distress.

*Seltzer*, ¶ 97 (footnote omitted).

¶82 In the case at bar, we similarly refuse to engage in speculation concerning how the jury apportioned damages, and conclude that the jury's award of compensatory damages was supported by substantial credible evidence.

¶83 **Issue Seven:** *Did the District Court err in denying the Defendants' motions for dismissal and judgment as a matter of law as to defendants Drook, Hanson, Schrum, Kovash, and Kliewer?*

¶84 Prior to trial, the Defendants moved to dismiss Drook, Schrum, Hanson, Kovash, and Kliewer, arguing that the individual defendants, acting as employees and officers of Northwestern, could not be held personally liable for the acts of Northwestern Corporation. Citing to § 28-10-702(3), MCA, the Defendants asserted that personal liability for these defendants would lie only if they were found personally negligent or the jury concluded that their actions were tortious in nature. The Defendants asserted that the Retirees failed to produce any evidence that the actions of the individual defendants met this standard. Furthermore, the Defendants argued that the individual employees were acting within the course and scope of their employment and could not be held personally liable. The District Court denied the motion.

¶85 During trial, the Defendants moved for judgment as a matter of law with respect to these defendants. The Defendants argued that the Retirees failed to produce any evidence that Drook or Hanson took any action with respect to the Retirees or was involved in the

36

filing of any motions against them. Additionally, the Defendants asserted that while Schrum, Kliewer, and Kovash were involved in the corporate decision-making process with respect to the Top Hat Contracts and bankruptcy litigation, they did nothing outside the course and scope of their employment and did nothing malicious or untoward to any of the Retirees.

¶86 After hearing a response and summary of the evidence from the Retirees, the District Court denied the motion. Viewing the evidence in a light most favorable to the Retirees, the District Court concluded that judgment as a matter of law would be improper because the District Court did hear evidence concerning the presence of three of the defendants at board meetings where issues related to the termination of the Top Hat Contracts were discussed, and also heard evidence with respect to declarations that were filed by the two other individually-named defendants. *See Opinion*, ¶ 15.

¶87 The Defendants now appeal the denial of their motion for judgment as a matter of law. Relying upon *Kuhns v. Scott*, 259 Mont. 68, 853 P.2d 1200 (1993), and *Bottrell v. American Bank*, 237 Mont. 1, 773 P.2d 694 (1989), the Defendants assert that in order to sustain individual liability against the defendants, there must be substantial credible evidence that each acted for his own pecuniary benefit and against the best interests of the corporation, or that each acted outside the scope of his employment. Here, the Defendants assert that the Retirees failed to meet this burden.

¶88 Northwestern argues that the key piece of evidence presented against Drook, Hanson, and Schrum, was that the three of them attended a March 2004 meeting when Northwestern's board of directors voted to recommend rejection of all but one of the

37

non-qualified benefit plans. Northwestern asserts that the District Court relied on their presence at this meeting in denying the Defendants' motion for judgment as a matter of law. However, the individual defendants assert that their attendance at this meeting could not have given rise to personal liability, because their participation in that meeting was done in the best interest of the company and was not tortious in nature. Additionally, the Defendants argue that Drook and Hanson both testified that they were not actively involved in terminating the Top Hat Contracts. Similarly, the Defendants assert that Schrum was acting consistent with the interests of the corporation when he concurred in the decision not to notify the Retirees about the board's decision to terminate the Top Hat Contracts until after the Plan had been filed in bankruptcy court, and that he relied on the legal advice of Paul Hastings in agreeing to this decision.

¶89 The Defendants also assert that Kovash and Kliewer were only named in the lawsuit because of documents they signed on behalf of Northwestern in the bankruptcy proceedings. The Defendants argue that this level of participation alone was insufficient to give rise to personal liability since they were acting upon legal advice consistent with the best interests of Northwestern. Accordingly, the Defendants argue there was no evidence showing that any of these individual defendants acted for their own benefit, at odds with Northwestern's interests, or with an intent to harm the Retirees.

¶90 The Retirees assert that the motion for judgment as a matter of law was properly denied by the District Court. Citing to *Poulsen v. Treasure State Industries, Inc.*, 192 Mont. 69, 626 P.2d 822 (1981), and *Crystal Springs Trout Co. v. First State Bank of Froid*, 225 Mont. 122, 732 P.2d 819 (1987), the Retirees maintain that the proper

38

question in this case is not whether the individual defendants were acting within the course of their agency, but whether they personally participated in tortious conduct. Because the jury found all the individual defendants liable for both malicious prosecution and abuse of process, the Retirees argue that the District Court did not err in denying their motion for judgment as a matter of law on this claim.

¶91    Contrary to the Defendants' characterization of the record, the Retirees assert that Drook, Hanson, and Schrum all personally oversaw the efforts to illegally terminate the Top Hat Contracts and pursue litigation against the Retirees in bankruptcy court. The Retirees argue that the malicious intent of these individuals was established based on their participation in Northwestern's decision to terminate the Top Hat Contracts without giving them notice. Additionally, the Retirees argue that Kliewer and Kovash committed perjury by signing false declarations in bankruptcy court, with Kliewer specifically verifying the bankruptcy court complaint. Finally, the Retirees maintain that these defendants received "bonuses" for their misconduct from Northwestern. The Defendants reply by disputing the applicability of *Poulsen*, and arguing that under *Phillips v. Mont. Educ. Assn.*, 187 Mont. 419, 610 P.2d 154 (1980), these individuals were shielded from liability if they were acting in good faith and in the best interests of the corporation.

¶92    As we stated in *Phillips*,

> Corporate officers or directors are privileged to interfere with or induce breach of the corporation's contracts or business relations with others as long as their actions are in good faith and for the best interests of the corporation. Where an officer or director acts against the best interests of the corporation, acts for his own pecuniary benefit, or with the intent to harm the plaintiff, he is personally liable.

39

*Phillips*, 187 Mont. at 425, 610 P.2d at 158 (citations omitted); *accord Bottrell*, 237 Mont. at 25, 773 P.2d at 708-09. Similarly, in *Crystal Springs Trout Co.*, we held that corporate agents could be held personally liable if they were personally negligent or their actions were tortious in nature. *Crystal Springs Trout Co.*, 225 Mont. at 129, 732 P.2d at 823. "The personal nature of the agent's actions forms the narrow exception to the general policy that officers and agents of a corporation must be shielded from personal liability for acts taken on behalf of the corporation." *Crystal Springs Trout Co.*, 225 Mont. at 129, 732 P.2d at 823 (citing *Little v. Grizzly Mfg.*, 195 Mont. 419, 636 P.2d 839, 842 (1981)).

¶93 Because this is an appeal from the District Court's denial of judgment as a matter of law, our inquiry is whether there was a complete absence of any evidence which would justify submitting this issue to a jury. *Vader*, ¶ 20. Our role is not to pass judgment on which side's evidence was more persuasive, or to otherwise place ourselves in the role of the fact finder, as that is the province of the jury. Here, our review of the record demonstrates that there was sufficient evidence to submit the Retirees' tortious interference with contract, abuse of process, and malicious prosecution claims against the individual defendants to the jury. The jury was presented with testimony and evidence arguably supporting the Retirees' claims that the acts of the individual defendants were in bad faith or tortious in nature. The Retirees argued to the jury that the individually-named defendants were personally involved in the termination of the Top Hat Contracts and argued this conduct was tortious based on: (1) the fact the individual defendants ratified a decision to wait until after bankruptcy proceedings had been initiated to inform

40

the Retirees of their intention to terminate the Top Hat Contracts; (2) the assertions that this decision was not based on a cost-benefit analysis with respect to Northwestern; (3) the manner in which those proceedings were initiated in bankruptcy court; and (4) the allegations that the termination of these Top Hat Contracts was clearly contrary to the terms of the UPA just negotiated by Northwestern and therefore contrary to law and without probable cause. Furthermore, the Retirees argued that the individually-named defendants were "rewarded" for their actions by receiving large bonuses after reorganization, while the Top Hat Contracts were terminated.

¶94 We conclude that the evidence before the court was sufficient to sustain the claims against the individually-named defendants, and that the District Court did not err in denying the Defendants' motion for judgment as a matter of law. From this evidence, the jury could have concluded that the individual defendants conduct was tortious in nature and directed at the Retirees, or it could have concluded that this evidence did not support such a conclusion. In any event, this evidence was sufficient to survive a motion for judgment as a matter of law. Moreover, the fact that the jury found these individual defendants *not liable* for tortious interference with contracts or punitive damages, but did find them liable for malicious prosecution and abuse of process, demonstrates that the jury did not simply lump these individual defendants in with the acts of the corporate defendant Northwestern, but instead individually considered their actions in relation to each claim based on the evidence before it.

¶95 In his dissent, Justice Rice is critical of our resolution of this issue, which he argues "extensively broadens our law regarding the personal liability of corporate

employees in order to affirm the imposition of personal liability here." Dissent, ¶ 105. Justice Rice's dissent raises valid concerns on the issue of when an agent is shielded from personal liability for acts done in an official capacity and taken on behalf of a corporation. Our caselaw does not draw a bright line between tortious conduct committed by a corporate agent which subjects him to personal liability, and conduct which may cause another party damage, but is nonetheless not actionable in a personal sense due to the corporate presence. It is not our intent to broaden the law in this area in any regard. Instead, our holding here is simply based on the quantum of evidence presented to the jury and whether it was sufficient for the jury to infer tortious conduct on behalf of the individual defendants. In this regard, we note that the Defendants never requested a jury instruction to clarify for the jury the difference between conduct which is tortious in nature and gives rise to personal liability, and that which is taken on behalf of a corporation and exempted from such liability. We leave any final pronouncements regarding this issue to a case in which these issues are fully and squarely before the district court.

¶96 **Issue Eight:** *Did the District Court err in denying the Defendants' post-trial motion to offset the judgment against the amount of the Retirees' pre-trial settlement with Paul Hastings?*

¶97 After judgment was entered in this case, the Defendants moved to offset the award of compensatory damages based on Paul Hastings' pre-trial settlement with the Retirees. The District Court denied both a motion to reveal the confidential settlement and to grant the offset. In its order, the District Court explained that an offset was unavailable under Montana law because Northwestern and the individual defendants were found liable for

42

intentional torts, and offsets are available under Montana law only in cases of comparative negligence. Moreover, the District Court noted that the Defendants had agreed to a verdict form which did not lend itself to a precise comparison of the injuries the jury found were apportioned among the Defendants and Paul Hastings, thus leaving unanswered whether the concerted action of the Defendants and Paul Hastings caused a single, indivisible harm to each of the Retirees.

¶98 The Defendants now appeal the denial of their post-trial motion to offset the award of compensatory damages. They argue that they are entitled to a pro tanto offset against the amount of the pre-trial settlement with Paul Hastings under Montana law. We disagree. As a practical matter, it is virtually impossible for this Court to determine the extent to which Paul Hastings bears any liability for the tortious conduct which the jury found was committed by the Defendants. As noted by the District Court, the verdict form does not apportion liability among the Defendants and Paul Hastings, or provide any guidance as to whether the conduct of Paul Hastings resulted in any harm to the Retirees, much less a single, indivisible harm. Yet, as the Defendants themselves note, a pro tanto offset such as they are now seeking is permitted only if they can show that Paul Hastings, as a concurrent or joint tortfeasor, caused the Retirees a single "indivisible harm" in concert with the Defendants. *See Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 104, 303 Mont. 274, 16 P.3d 1002.

¶99 Even further, the verdict form gives no indication as to how or if the jury apportioned damages among the claims for breach of contract, and the torts of bad faith breach of contract, malicious prosecution, and abuse of process; thus, we would have to

engage in gross speculation were we to assess how the award of damages corresponds to the jury's finding of liability on each of the Retiree's claims, and what percentage of those damages should be theoretically attributed to the actions of Paul Hastings. In short, the Defendants ask this Court to untangle and dissect the jury's verdict without any factual basis upon which to do so. Because the verdict form was used without objection, we cannot and will not now second guess the jury's allocation of damages.

¶100 Finally, we note that in *Cartwright v. Equitable Life Assur. Soc. of the United States*, 276 Mont. 1, 914 P.2d 976 (1996), we held that there is no statutory basis in Montana for an offset of damages arising from the commission of intentional torts. *See Cartwright*, 276 Mont. at 36, 914 P.2d at 998. Therefore, we decline to disturb the District Court's denial of the post-trial motion.

## CONCLUSION

¶101 We affirm the jury's verdict and the various rulings of the District Court before, during and after trial. However, we grant the request made by the Defendants to remand the judgment in this case to the District Court so that it can be reduced by the amount of payments Northwestern has been making to the Retirees under the terms of their Top Hat Contracts since the judgment in this matter was originally entered. Affirmed and remanded.

/S/ PATRICIA O. COTTER

44

We concur:

/S/ KATHERINE M. IRIGOIN
District Court Judge Katherine M. Irigoin
sitting for Chief Justice Mike McGrath

/S/ W. WILLIAM LEAPHART


/S/ JAMES C. NELSON

/S/ JULIE MACEK
District Court Judge Julie Macek
sitting for Justice Brian Morris




Justice Jim Rice, dissenting.

¶102   I dissent from the Court's resolution of Issues 2 and 7, and would remand for a new trial.

¶103   Under Issue 2, the Court announces a new rule—that "advice-of-counsel, when used as an affirmative defense at trial, must be pled as such under the requirements of M. R. Civ. P. 8(c)." Opinion, ¶ 54.  Thus, the Court has overruled *McGuire*'s holding that the advice-of-counsel defense "may be shown under a general denial in the answer." *McGuire*, 184 Mont. at 413, 603 P.2d at 256 (quoting *Materson v. Pig'n Whistle Corp.,* 326 P.2d 918, 929 (Cal. App. 1958)).  While I concur with this conclusion, I believe it is unfair to Northwestern to change a previously clear rule which was in effect and upon which it relied during the litigation.  Under *McGuire,* the District Court incorrectly ruled

that Northwestern had waived the defense and was not entitled to so instruct the jury. I believe Northwestern was prejudiced thereby. The Court reasons that Northwestern was not harmed because the District Court allowed Northwestern to present evidence concerning its reliance upon its counsel's advice to defend against the allegation it acted in bad faith. However, such evidence must be admitted in any event in support of a general denial of the claim. The definition of probable cause we have adopted from the *Restatement (Second) of Torts* § 675 (1977) for malicious prosecution cases is satisfied when a defendant reasonably believes that the claim he pursued was valid under applicable law "in reliance upon the advice of counsel." *Hughes v. Lynch*, 2007 MT 177, ¶ 16, 338 Mont. 214, 164 P.3d 913. Thus, such evidence must be admitted in the course of proving or denying the proof of a malicious prosecution claim.

¶104 Northwestern wanted, and I believe was entitled to, more—an instruction that reliance upon advice of counsel could be a complete defense to the claim. Indeed, the Retirees used the counsel defense as a basis to both request that Hastings be added as a defendant and to seek discovery of privileged documents. As a result, the District Court granted Retirees' motion to amend the complaint and also granted their motion to compel discovery of materials that would otherwise be protected by the attorney-client and work-product privileges. The privileged documents sought by Retirees were certainly relevant to their malicious prosecution claim, as they had to prove that Northwestern lacked probable cause to file the bankruptcy action. However, after permitting the additional claim and the discovery to support the additional claim, the District Court barred Northwestern from raising the actual defense—which Northwestern was not required to

46

affirmatively plead under *McGuire*. I believe Northwestern was unfairly constrained in the ability to defend itself and would order a new trial.

¶105 I also dissent with the Court's resolution of Issue 7, which I believe extensively broadens our law regarding the personal liability of corporate employees in order to affirm the imposition of personal liability here. Our cases illustrate, and we have instructed, that "[t]he personal nature of the agent's actions forms *the narrow exception* to the general policy that officers and agents of a corporation must be shielded from personal liability for acts taken on behalf of the corporation." *Crystal Springs Trout Co. v. First St. Bank*, 225 Mont. 122, 129, 732 P.2d 819, 823 (1987) (emphasis added) (citing *Little v. Grizzly Mfg.*, 195 Mont. 419, 636 P.2d 839 (1981)). The corporate officers' actions in this case did not exceed the scope of their employment, and did not trigger this narrow exception.

¶106 In *Bottrell v. Am. Bank*, 237 Mont. 1, 12-14, 773 P.2d 694, 701-02 (1989), the bank, under the direction of its officers, wrongfully exercised its right to setoff of a note not yet due and payable, before making any demand of the borrower for payment, as required under the terms of the note. The plaintiffs suffered lost profits as a result of the bank's actions. *Bottrell*, 273 Mont. at 22, 773 P.2d at 707. We held the officers could not be held personally liable for these obvious errors, explaining:

> [T]he actions of officers Beaton and Derrig were not on behalf of themselves as individuals or for their own pecuniary benefit, nor were their actions against the best interests of the corporation for which they were employed. They acted within the scope of their employment, and in furtherance of corporate interest. As such, they are entitled to the protection of the corporate shield from personal liability.

47

*Bottrell*, 237 Mont. at 25, 773 P.2d at 708.

¶107    Likewise, in *Kuhns v. Scott*, 259 Mont. 68, 74, 853 P.2d 1200, 1204 (1993), the plaintiffs contended the CEO of First Interstate Bancsystem of Montana, Inc., (FIBM) maliciously caused FIBM to breach its duties under the stock purchase agreement between the parties. We rejected plaintiffs' assertions that the CEO had failed to increase FIBM's capital and obtain the FIBM Board's approval of the stock purchase for the reason that his personal interest in the bank's ownership would have been diluted by doing so. *Kuhns*, 237 Mont. at 74, 853 P.2d at 1204. We held that in order to establish a claim against the CEO, the plaintiffs "would have to show that [the CEO] had acted for his own pecuniary benefit and against the best interests of the corporation (FIBM); or that he had acted outside the scope of his employment." *Kuhns*, 259 Mont. at 74-75, 853 P.2d at 1204 (citing *Bottrell*, 237 Mont. at 25, 773 P.2d at 708). We reasoned that plaintiffs' assertions about the CEO's ownership interest were speculative and the lack of evidence about a personal benefit or that he had acted against FIBM's best interests warranted the entry of summary judgment. *Kuhns*, 259 Mont. at 75, 853 P.2d at 1204-05.

¶108    In cases where we have reached the opposite result, our decisions turned on substantial evidence demonstrating the employees had knowingly made false and misleading statements or taken fraudulent actions. As the Court notes, it is the "personal nature" of these agents' actions that permitted the agents to be held personally liable for the actions they took on behalf of the corporation. Opinion, ¶ 91. In *Crystal Springs Trout Co.*, 225 Mont. at 128, 732 P.2d at 822, 823, the president and primary shareholder of the First State Bank repeatedly lied about filing a loan application with the FmHA,

about banks he had contacted, and about the status of plaintiffs' financing. We described the officer's conduct as "intentional and very personal," citing the conclusion of the trial court:

> The conduct of defendant [bank president], acting at all times as agent of the First State Bank of Froid and with the acquiescence and tacit approval of the directors of the bank, constituted willful and wanton misconduct consisting of conscious breach of trust and fiduciary duty, intentional deception, flagrant breach of the ethical cannons [sic] of both the legal and banking profession, a studied and extended course of fraudulent misrepresentation and knowing betrayal of a lifetime friendship, all with reckless disregard for the rights and interest of the plaintiffs herein, unjustified by any circumstance and "malicious" and "oppressive" within the meaning of those terms as applied in the law of torts.

*Crystal Springs Trout Co.*, 225 Mont. at 129, 732 P.2d at 823.

¶109  In *Poulsen v. Treasure St. Indus.*, 192 Mont. 69, 72, 75, 626 P.2d 822, 824-25 (1981), the president of Treasure State Industries, Inc., made clearly untruthful statements about the company's compliance with health regulations to plaintiffs, who were looking to purchase the concrete block plant operated by the company, and thereby induced plaintiffs to purchase the plant. We held that the president was personally liable because his individual acts were fraudulent, meeting all of the elements of actual fraud. *Poulsen*, 192 Mont. at 79, 82, 626 P.2d at 828-29.

¶110  The Retirees' allegations that the individual defendants tortiously a participated in the termination of the Top Hat Contracts during the bankruptcy court process are directed to actions clearly within the scope of the defendant's employment. There is no substantial evidence, as in *Crystal Springs* and *Poulsen*, that these corporate officers made false statements, acted fraudulently, or acted in pursuit of personal gain. The jury

49

found that the officers were not liable for tortious interference with the contracts. Further, there is no evidence that the bonuses, which the Retirees assert is proof of the officers' personal pecuniary gain, were linked to the decision to terminate the contracts. The bonuses were provided to the officers for their role in guiding Northwestern through its reorganization and emergence as a new entity, in accordance with common business practices. Perhaps in the times we now live such common corporate practices are popularly thought to be inappropriate. Nonetheless, without more, these bonuses do not constitute a basis for personal liability under our precedent. The evidence is that these rewards were given for the officers' actions on behalf of the company. Thus, Retirees' theory that the officers personally benefitted directly from the Top Hat situation requires the same sort of speculation we rejected as insufficient in *Kuhns*. The evidence does not demonstrate that Retirees' claims fit within the "narrow exception" to the general rule against personal liability. *Crystal Springs Trout Co.*, 225 Mont. at 129, 732 P.2d at 823. Nothing close to what we condemned at length in *Crystal Springs Trout Co.* occurred here.

¶111 I would enter judgment in favor of the individual defendants on the claim of personal liability and remand for a new trial.


/S/ JIM RICE

Justice John Warner joins the dissent of Justice Jim Rice.


/S/ JOHN WARNER